**FILED**

Jeffrey A. Apperson, Clerk

AUG 2 8 2003

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. NATURAL RESOURCES DEFENSE COUNCIL, et al., <br><br> Plaintiff, <br><br> v. <br><br> LOCKHEED MARTIN CORPORATION, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.
5:99CV00170-M

## UNITED STATES' AMENDED COMPLAINT

The United States of America ("United States" or "government"), for its complaint, states as follows:

### I. Jurisdiction and Venue

1.      This is an action by the United States against defendants Lockheed Martin Corporation and its predecessor, Martin Marietta Corporation; Lockheed Martin Energy Systems and its predecessor, Martin Marietta Energy Systems (referred to collectively as "Energy Systems"); and Lockheed Martin Utility Services and its predecessor, Martin Marietta Utility Services (referred to collectively as "Utility Services"), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act and subsequent amendments ("RCRA"), 42 U.S.C. § 6901 *et seq.,* and at common law.

2.      The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3732,

42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and

equitable jurisdiction.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, 31

U.S.C. § 3732, and 42 U.S.C. § 6928(a).

## II. The Facility and the Parties

4.      This action involves the Paducah Gaseous Diffusion Plant ("PGDP") located near

Paducah, Kentucky.  The PGDP is owned by the United States Department of Energy ("DOE").

The PGDP was operated during the relevant period by subsidiaries of defendants Martin

Marietta Corporation and its successor, Lockheed Martin Corporation.  The PGDP is a "uranium

enrichment" plant.

5.      The process of "uranium enrichment" is designed to increase the concentration by

weight of the fissile isotope of uranium, i.e., U-235, and decrease the concentration of the non-

fissile, heavier isotope found predominantly in natural uranium ore, i.e. U-238.  Through an

increase in the concentration of U-235, uranium is made useful for purposes of producing energy

either for nuclear weapons or for nuclear power.

6.      During the 1940's and early 1950's, the government developed "gaseous

diffusion" as a technology for separating and/or concentrating U-235 from natural uranium ore

and/or other uranium sources.  The process of gaseous diffusion involves a vast series of

compressors and converters linked together in "cascades."  The electric-powered compressors

inject uranium hexafluoride gas into the cascades, where it is then diffused through porous tubes,

resulting in a higher concentration of U-235.  This process is repeated numerous times until the

product is sufficiently enriched in U-235.

2

7.      Defendant Lockheed Martin Corporation ("Lockheed Martin") is a Maryland corporation with its principal office and place of business located at 6801 Rockledge Drive, Bethesda, Maryland.  Lockheed Corporation and defendant Martin Marietta Corporation ("Martin Marietta") merged in 1995 to form defendant Lockheed Martin Corporation.  At all times relevant to this Complaint, Lockheed Martin, or its predecessor corporation, Martin Marietta, owned defendants Martin Marietta Energy Systems, Lockheed Martin Energy Systems, Martin Marietta Utility Services, and Lockheed Martin Utility Services.

8.      Defendant Martin Marietta Energy Systems ("MMES"), a Delaware corporation, managed and operated the PGDP from April 1, 1984 through June 19, 1995, pursuant to several contracts with DOE (which are more fully described below).  MMES was a wholly-owned subsidiary of defendant Martin Marietta, which by agreement with DOE guaranteed MMES's performance of its contracts with DOE.

9.      From July 1, 1993 until June 19, 1995, a portion of defendant MMES's responsibilities for managing and operating the PGDP–i.e., the operation of the uranium enrichment facilities at the PGDP--was shifted to defendant Martin Marietta Utility Services ("MMUS"), another wholly-owned subsidiary of Martin Marietta, which is described more fully below.  However, MMES retained responsibilities under its contracts with DOE to perform various environmental restoration, site custodial, waste management, and other related services at the PGDP.

10.     Effective June 19, 1995, upon the merger of Lockheed Corporation and Martin Marietta, defendant Lockheed Martin Energy Systems ("LMES"), a Delaware corporation, assumed the contracts of defendant MMES with DOE.  From June 19, 1995 until April 1, 1998, LMES succeeded to defendant MMES's responsibilities under those contracts to perform various

3

environmental restoration, site custodial, wastes management, and other related services at the PGDP. MMES and LMES are collectively referred to below as "Energy Systems."

11. The enactment by Congress of the Energy Policy Act of 1992, called for the creation of a government-owned corporation, the United States Enrichment Corporation ("USEC"), to lease from DOE and operate the uranium enrichment facilities at the PGDP. USEC did in fact lease those facilities from DOE pursuant to a Lease Agreement effective July 1, 1993. DOE continued as owner of the entire PGDP site, continued to operate those buildings and grounds at the PGDP not leased to USEC, continued to be responsible for environmental restoration, site custodial, wastes management, and other related services and continued to be responsible for environmental compliance as to "legacy wastes," i.e., those generated prior to July 1, 1993, including legacy wastes stored inside buildings leased to USEC, with Energy Systems as its contractor for carrying out those responsibilities.

12. Defendant Martin Marietta Utility Services ("MMUS"), a Delaware corporation, was created as a wholly-owned subsidiary of Martin Marietta to operate the uranium enrichment facilities that USEC had leased from DOE. MMUS operated those facilities pursuant to government contracts with USEC, which contracts are more fully described below. By agreement with USEC, Martin Marietta guaranteed the performance of MMUS under those contracts.

13. Defendant Lockheed Martin Utility Services ("LMUS"), a Delaware corporation, is wholly owned by defendant Lockheed Martin Corporation. LMUS assumed the contracts of defendant MMUS with USEC upon the merger of Lockheed Corporation and Martin Marietta, effective June 19, 1995. LMUS continued to operate the PGDP under contract with USEC until

4

May 1, 1999, at which time the LMUS contract ended, and USEC began operating the facilities itself.

14.     During times relevant to this Complaint, the PGDP was subject to environmental regulation pursuant to RCRA and other environmental laws of the United States, which laws were administered by the United States Environmental Protection Agency ("EPA") and the Commonwealth of Kentucky ("State").

15.     The False Claims Act, 31 U.S.C. § 3730(b) provides that private persons may file an action pursuant to 31 U.S.C. §§ 3729 *et seq.* for the private person and the United States against a person violating the Act. The private person initiating such an action is called a "relator."

16.     Relator Natural Resources Defense Council ("NRDC"), a not-for-profit corporation, is a national environmental public interest organization. The NRDC maintains an office at 1200 New York Avenue, N.W., Suite 400, Washington, D.C. 20005.

17.     Relator Thomas B. Cochran, Ph.D., is the Director of the Nuclear Program and holds the Wade Green Chair for Nuclear Policy at the NRDC. Dr. Cochran also has an office at 1200 New York Avenue, N.W., Suite 400, Washington, D.C. 20005.

18.     Relator Ronald B. Fowler has worked at the PGDP since 1991 and is currently a Production Support Training Manager at PGDP, where one of his jobs has been to identify and report safety concerns to senior management. He resides in Paducah, Kentucky.

19.     Relator Charles F. Deuschle has worked at the PGDP from 1992 to 2003, during which time he resided in Paducah, Kentucky.

20.     Relator Garland ("Bud") E. Jenkins worked at the PGDP from 1968 until his retirement on May 31, 1999. Prior to retiring, Mr. Jenkins worked as a chemical operator at the

chemical feed plant at the PGDP, and in other capacities at the site. He resides in Benton, Kentucky.

21.     Relators NRDC, Cochran, Fowler, Dueschle, and Jenkins filed the instant action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) on June 1, 1999. Pursuant to 31 U.S.C. § 3730(b)(2), on May 30, 2003, the government intervened in a part of their action and declined a part of their action.

22.     John David Tillson is a citizen and resident of the Commonwealth of Kentucky, who was employed at the PGDP from 1992 to 1996 by Science Applications International Company (SAIC), a subcontractor for Energy Systems. Mr. Tillson is the relator in the related *qui tam* case of *United States ex rel. Tillson v. Lockheed Martin Energy Systems, et al.,* Civil Action No. 5:00CV-39-R. On May 30, 2003, the government intervened in a part of Mr. Tillson's action and declined a part of his action.

### III. The DOE-Energy Systems Contracts

23.     As more particularly alleged in paragraphs 24-41 below, during all times relevant to this Complaint, in addition to being statutorily obligated to do so, Energy Systems was contractually obligated through its contracts with DOE to comply with RCRA in its treatment, storage and disposal of solid and hazardous wastes at the PGDP, having the specific responsibility for day-to-day RCRA activities at the site, including, but not limited to, waste analyses and handling, monitoring, record keeping, reporting, and contingency planning. Also, as specifically alleged below, Energy Systems was contractually bound to truthfully report any and all noncompliances with RCRA to DOE and to Federal and State environmental regulators.

24.     In 1984, MMES first entered into its contract with DOE to operate the PGDP. This contract, denominated Contract DE-AC05-84OR21400 ("Contract 21400"), also covered

MMES's operation for DOE of three other facilities: the Y-12 Nuclear Weapons Plant, the Oak

Ridge National Laboratory, and the K-25 Gaseous Diffusion Plant.  Contract 21400 was

modified from time to time over the ensuing years.  Under another contract, denominated

Contract DE-AC05-76OR0001 ("Contract 0001"), MMES operated the Portsmouth Gaseous

Diffusion Plant in Piketon, Ohio for DOE.

     25.     On September 29, 1989, the contractual instrument governing the operation of

PGDP was changed from Contract 21400 to Contract 0001.  This occurred through modification

M039 to Contract 21400, which deleted the PGDP from the statement of work for that contract;

and modification M084 to Contract 0001, which added the PGDP to the statement of work for

that contract.

     26.     Effective April 1, 1991, the parties entered into modification M102 of Contract

0001, which contained the following terms, and required MMES to comply with environmental

laws including RCRA in operating the PGDP for DOE.  Clause C.1, the "STATEMENT OF

WORK," provided in C.1(a) that MMES was to

> manage, operate and maintain . . . the plants and facilities
> described below [including the PGDP] and to perform the work
> and services described in this contract . . . upon the terms and
> conditions herein provided and in accordance with such directions
> and instructions not inconsistent with this contract which DOE
> may deem necessary or give [MMES] from time to time.  In the
> absence of applicable directions and instructions from DOE,
> [MMES] will use its best judgment, skill, and care in all matters
> pertaining to the performance of this contract.  [MMES] will not
> be required to operate the plants described below in any manner
> which it deems unsafe to the plants or personnel (including any
> third parties and members of the public).

     27.     In addition to uranium enrichment activities, the STATEMENT OF WORK,

Clause C.1,  provided in C.1(b) that MMES was to perform environmental and health activities

related to the enrichment of uranium; environmental protection and remediation services;

environmental restoration activities including the integrating contractor role regarding receiving

and disposal of environmental restoration-generated wastes; and research, development, design

and demonstration activities to satisfy environmental protection, safety and health requirements.

28.    Clause I.60, "ENVIRONMENT, SAFETY, AND HEALTH," of modification

M102 of Contract 0001 provided in pertinent part that MMES was to "take all reasonable

precautions in the performance of the work under this contract to protect the environment and

the safety and health of employees and of members of the public and shall comply . . . with all

applicable environmental, safety and health regulations and requirements (including reporting

requirements) of DOE." In 1991, RCRA was among the environmental requirements applicable

to the plant.

29.    Clause I.76, "PERMITS OR LICENSES," of modification M102 of Contract

0001, provided:

> (a)    Except as otherwise directed by the Contracting Officer,
> [MMES] shall procure all necessary permits or licenses and abide
> by all applicable laws, regulations, and ordinances of the United
> States and of the state . . . and political subdivision in which the
> work under this contract is performed.
>
> (b)    With respect to permits under the Resource Conservation
> and Recovery Act (RCRA) and related state statutes, the parties
> entered into an agreement on October 2, 1990, for facilities in
> Piketon, Ohio and Paducah, Kentucky, which is attached to this
> contract as Appendix D, which describes the roles and
> responsibilities of DOE and Energy Systems in obtaining and
> complying with RCRA permits for those facilities. The terms of
> Appendix D, as they may be modified from time to time, shall
> control the responsibilities of [MMES] imposed by subparagraph
> (a) above, as they relate to compliance with RCRA.

30.     Appendix D, in turn, provided that Energy Systems would sign the PGDP's RCRA permit as a "co-operator" with RCRA responsibilities for day-to-day operations including waste analyses and handling, monitoring, record keeping, reporting, and contingency planning; that DOE would sign the permit as owner and operator with responsibilities for policy, programmatic, funding, scheduling decisions, and general oversight; and that for purposes of the certification required by 40 C.F.R. Section 270.11(d), DOE's and Energy Systems' representatives would certify, to the best of their knowledge and belief, the truth, accuracy and completeness of the application for their respective areas of responsibility.  Appendix D also provided that Energy Systems had primary responsibility for the preparation and submission of RCRA permit applications and permits, for spill reports, for reports of non-compliances that might endanger health and the environment, for reports of unmanifested wastes, for annual solid waste management units listings, and for land disposal restrictions. The agreement also expressly provided that "Energy Systems is expected to notify the regulators and DOE of newly discovered noncompliances."

31.     Clause I.64, ALLOWABLE COST AND FEE, of modification M102 of Contract 0001 provided in pertinent part that Energy Systems would be paid an award fee for performance of the work under the contract, and that the government would reimburse Energy Systems for many of the costs it incurred in performing such work, but that any losses and expenses resulting from willful misconduct or lack of good faith by Energy Systems's directors, corporate officers, or supervising representatives would be unallowable costs under the contract.

32.     Effective July 1, 1993, through modification M107 of Contract 21400, MMES's responsibilities for operating the PGDP were transferred back under Contract 21400 (from Contract 0001) with changes to the scope of work reflecting the fact that uranium enrichment

operations were thence to be the responsibility of MMUS acting under contracts with USEC, and no longer the responsibility of MMES. MMES retained responsibility, however, for RCRA compliance with regard to "legacy wastes," and wastes newly generated in the course of environmental restoration and waste management activities at the site, pursuant to contractual provisions imposing RCRA obligations on MMES that were the same in all material respects as those imposed under modification M102 of Contract 0001, including Appendix D thereto, as summarized in paragraphs 26-31, above.

33.    Effective October 1, 1995, DOE and LMES entered into modification M152 of Contract 21400. Clause C.1, "STATEMENT OF WORK," of this modification obligated LMES to manage, among other things, DOE's Environmental Management and Enrichment Facilities Programs. Clause C.1(d) provided in pertinent part: "The primary mission of the Environmental Management and Enrichment Facilities Programs is to provide environmental restoration and waste management services, technology development, and operations management for the DOE . . . facilities not leased to the United States Enrichment Corporation in Paducah, Kentucky . . . ." This clause specified as programmatic activities to be performed by LMES the following: "[e]nvironmental restoration activities including characterizations, investigations, and remediations supporting . . . RCRA actions"; "treating, storing, and disposing of environmental restoration generated wastes"; "environmental protection [and] remediation activities"; and "[w]aste management activities, including . . . operation of waste treatment, storage, and disposal facilities."

34.    Clause 1.105, ENVIRONMENTAL PROTECTION," of modification M152 of Contract 21400 provided in pertinent part:

10

        (a)     In addition to complying with the requirements set forth in the "CLEAN AIR AND WATER" clause, in the performance of this contract [LMES] shall comply, as applicable, with the following . . . :

           (4) The Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. 9601 et seq.) . . . .

35.    Clause I.75, "ENVIRONMENT, SAFETY AND HEALTH," of modification M152 of Contract 21400 provided in pertinent part:

        (a)     [LMES] shall perform the work under this contract in a manner that is safe and healthy, and environmentally acceptable and shall develop and manage a comprehensive program in support of these objectives.

        (b)     In addition to the requirements in the contract clause, "ENVIRONMENTAL PROTECTION," [LMES] shall comply with applicable Federal and non-Federal safety and health laws, codes, ordinances, and regulations . . . [LMES] shall cooperate appropriately with Federal and non-Federal agencies having jurisdiction over environmental and safety and health matters under this contract.

36.    Clause I.92, "PERMITS OR LICENSES," of modification M152 of Contract 21400 provided:

        Except as otherwise directed by the Contracting Officer, [LMES] shall procure all necessary permits or licenses and abide by all applicable laws, regulations, and ordinances of the United States and of the state . . . and political subdivision in which the work under this contract is performed.

37.    Appendix D to modification M152 of Contract 21400, dated August 30, 1995, in terms materially the same as those incorporated into earlier modifications of the Contract, provided that Energy Systems would sign the PGDP's RCRA permit as a "co-operator" with RCRA responsibilities for day-to-day operations including waste analyses and handling, monitoring, record keeping, reporting, and contingency planning; that DOE would sign the

permit as owner and operator with responsibilities for policy, programmatic, funding, scheduling decisions, and general oversight; and that for purposes of the certification required by 40 C.F.R. Section 270.11(d), DOE's and Energy Systems' representatives would certify, to the best of their knowledge and belief, the truth, accuracy and completeness of the application for their respective areas of responsibility. Appendix D also provided that Energy Systems had primary responsibility for the preparation and submission of RCRA permit applications and permits, for spill reports, for reports of non-compliances that might endanger health and the environment, for reports of unmanifested wastes, for annual solid waste management units listings, and for land disposal restrictions. The agreement also expressly provided that "Energy Systems is expected to notify the regulators and DOE of newly discovered noncompliances."

38.     Clause B.2, "BASIC FEE AND AWARD FEE," of modification 152 of Contract 21400 provided that Energy Systems would be paid a base fee and an award fee for performance of the work under the contract.

39.     In addition, Clause B.3, "PERFORMANCE-BASED INCENTIVE FEE," of modification 152 of Contract 21400 provided that Energy Systems could receive performance incentive fees as an inducement to maximize its performance in the environmental restoration and waste management areas, among others. However, subparagraph (d) of this clause provided that Energy Systems could forfeit the performance incentive fee for the willful or knowing violation of any regulatory reporting requirements by any of its managerial personnel.

40.     Clause I.78, "ALLOWABLE COSTS AND FEE," modification M152 of Contract 21400 provided that the government would reimburse Energy Systems for many of the costs it incurred in performing the  work under the contract, but that any losses and expenses resulting

from willful misconduct or lack of good faith by Energy Systems's managerial personnel would be unallowable costs under the contract.

41.     Although Contract 21400 was modified from time to time subsequent to the execution of modification M152, none of those modifications changed in material respects LMES's environmental compliance obligations including its obligations to comply with RCRA and to report environmental noncompliances to DOE and to regulators.

### IV.  The USEC-Utility Services Contracts

42.     Contract USECHQ-93-C-001 ("Contract 93-C-001") between USEC and Utility Services governed Utility Services' managment of USEC's uranium enrichment operations at the PGDP, effective July 1, 1993.  Clause A.11, "ENVIRONMENTAL REGULATIONS," provided that "[Utility Services] will take all reasonable precautions in the performance of the work under this Contract so as to protect the environment and shall comply with all applicable environment [sic] regulations and requirements (including reporting requirements) of applicable regulatory agencies."

43.     Clause I.76(a), "PERMITS OR LICENSES," of Contract 93-C-001 provided in pertinent part "Except as otherwise directed by the Contracting Officer, [Utility Services] shall procure all necessary permits or licenses and abide by all applicable laws, regulations, and ordinances of the United States and of the state . . . in which the work under this contract is performed."

44.     Clause I.64, "ALLOWABLE COST AND FEE," of Contract 93-C-001, provided that Utility Services would be paid a fee for performance of the work under the contract, and that the government would reimburse Utility Services for many of the costs it incurred in performing such work, but that any losses and expenses resulting from willful misconduct or lack of good

faith by Energy Systems's directors, corporate officers, or supervising representatives would be unallowable costs under the contract.

45.     Modification 006 of Contract 93-C-001, effective October 1, 1993, provided that Utility Services was eligible to be paid a $3,000,000 incentive fee, so long as it met all of a series of conditions precedent, including that it make no knowing or willful falsification of a required certification in the environmental area.

46.     Contract 93-C-001 was replaced by Contract USEC-96-C-001 ("Contract 96-C-001"), effective October 1, 1995. In Article XVI, Section 16.5 of this contract, Utility Services agreed that its "performance of the Services and of its other obligations under this Contract shall be in compliance with Applicable Law." "Applicable Law" was defined as including any national and state permit, law, statute, rule, regulation, ordinance, order, judgment, decree, directive or decision relating to environmental protection.

47.     Article VI, Section 6.4 of Contract 96-C-001 provided that Utility Services could earn incentive fees, and Schedule J to the contract provided that a condition precedent to its earning incentive fees was that Utility Services make no knowing or willful falsification of a required certification in the environmental area.

48.     Article VI, Section 6.2, together with Schedule F, of Contract 96-C-001 provided that the government would reimburse Utility Services for many of the costs it incurred in performing the work under the contract, but that any losses and expenses resulting from willful misconduct or lack of good faith by Utility Services's directors, corporate officers, or key persons would be unallowable costs under the contract.

49.     Thus, beginning in 1993, Utility Services was contractually obligated to comply with RCRA in its treatment, storage and disposal of solid and hazardous wastes at the PGDP,

14

and to make truthful reports regarding environmental conditions at the PGDP to USEC and to Federal and State environmental regulators.

## RCRA VIOLATIONS - 42 U.S.C. § 6928(a)

### Count I - Failure to Make Hazardous Waste Determinations

50.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 49, inclusive.

51.     On January 1, 1985, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), and 40 C.F.R. Part 271, Subpart A, EPA granted the State final authorization to administer its own hazardous waste management program in lieu of the federal hazardous waste management program established under Subchapter III of RCRA, 42 U.S.C. §§ 6921-6939b.

52.     On June 25, 1996, EPA granted the State final authorization to administer the hazardous waste management requirements and prohibitions imposed pursuant to the 1984 Hazardous and Solid Waste Amendments ("HSWA") to RCRA in lieu of the federal hazardous waste management program established under Subchapter III of RCRA, 42 U.S.C. §§ 6921-6939b.

53.     The provisions of the authorized Kentucky hazardous waste management program are federally enforceable by EPA upon notice to the state, pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

54.     Notice of the commencement of this action has been given to the State pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

15

55.     The defendants are "persons" as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(203); 32:005, Section 1(203); 34:005, Section 1(203); 37:005, Section 1(203); 38:005, Section 1(203).

56.     The PGDP is a "facility" as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(93); 32:005, Section 1(93); 34:005, Section 1(93); 37:005, Section 1(93); 38:005, Section 1(93).

57.     The defendants were "operators" of the PGDP, as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(192); 32:005, Section 1(192); 34:005, Section 1(192); 37:005, Section 1(192); 38:005, Section 1(192), from approximately 1984 to 1998.

58.     From approximately 1984 to 1998, the defendants generated large quantities of solid waste during their tenure as operator of the PGDP, including but not limited to hydrofluoric acid, media contaminated with trichloroethylene ("TCE") generated from remediation activities at the facility, spent batteries, waste oil, tanks, drums, discarded rags, discarded motor parts, and miscellaneous equipment containing liquids.

59.     From approximately 1984 to 1998, the defendants generated solid waste, as defined in 42 U.S.C. § 6903(27), 40 C.F.R. § 261.2, and 401 KAR 30:005, Section 1(26), at the PGDP, including but not limited to the solid wastes identified in paragraph 58.

60.     On numerous occasions between 1984 and 1998, the defendants failed to properly determine, in accordance with the provisions of 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2, if the solid waste it generated at the PGDP was hazardous waste, as defined in 42 U.S.C. § 6903(5), 40 C.F.R. § 261.3, and 401 KAR 30:005, Section 1(13); 31:005, Section 1(118); 32:005, Section 1(118); 34:005, Section 1(118); 37:005, Section 1(118); 38:005, Section 1(118), as required by 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2.

61.     Each failure by the defendants to make a hazardous waste determination pursuant to 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2, for the solid waste they generated at the PGDP constitutes a separate violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2.

62.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2, occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2, occurring on or after January 31, 1997.

## Count 2 - Failure to Comply with Land Disposal Restrictions For Hazardous Waste

63.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 62, inclusive.

64.     From approximately 1984 to 1998, the defendants took actions and implemented processes during their tenure as operator of the PGDP that produced hazardous waste, as defined in 42 U.S.C. § 6903(5), 40 C.F.R. § 261.3, and 401 KAR 30:005, Section 1(13); 31:005, Section 1(118); 32:005, Section 1(118); 34:005, Section 1(118); 37:005, Section 1(118); 38:005, Section 1(118), or caused a hazardous waste to become subject to regulation, including but not limited to trichloroethylene ("TCE"); hydrofluoric acid; aqua regia (nitric/hydrochloric acid mixture); sodium hydroxide; contaminated media generated from remediation activities at the facility

containing TCE/F001 listed waste; circuit boards, diodes, fuses, and capacitors containing

hazardous constituents; electrical components containing mercury; kerosene; and spent batteries.

65.      Between approximately 1984 and 1998, the defendants stored hazardous waste,

within the meaning of 40 C.F.R. §§ 260.10, 261.3 and 401 KAR 30:005, Section 1(13); 31:005,

Section 1(118), (266); 32:005, Section 1(118), (266); 34:005, Section 1(118), (266); 37:005,

Section 1(118), (266); 38:005, Section 1(118), (266), at the PGDP, including but not limited to

the wastes identified in paragraph 64.

66.      Each of the defendants is a "generator," as defined in 40 C.F.R. § 260.10 and 401

KAR 31:005, Section 1(111); 32:005, Section 1(111); 34:005, Section 1(111); 37:005, Section

1(111); 38:005, Section 1(111), of hazardous waste, including but not limited to the hazardous

wastes identified in paragraph 64.

67.      On numerous occasions between 1984 and 1998, the defendants failed to properly

determine, in accordance with the provisions of 40 C.F.R. § 268.7(a)(1) and 401 KAR 37:010,

Section 7(1), if the hazardous waste it generated at the PGDP required treatment in order to meet

the applicable standards set forth in 40 C.F.R. Part 268, Subpart D, and 401 KAR Chapter 37, for

land disposal, as defined in 42 U.S.C. 6924(k), 40 C.F.R. § 268.2(c) and 401 KAR 37:005,

Section 1(155), as required by 40 C.F.R. § 268.7(a)(1) and 401 KAR 37:010, Section 7(1).

68.      On numerous occasions between 1984 and 1998, the defendants shipped

hazardous waste to off-site treatment, storage and disposal ("TSD") facilities without sending a

notice indicating whether material being shipped contained hazardous waste and whether the

material being shipped met the applicable treatment standards set forth in 40 C.F.R. Part 268,

Subpart D, and 401 KAR Chapter 37, for land disposal, as defined in 42 U.S.C. 6924(k), 40

C.F.R. § 268.2(c) and 401 KAR 37:005, Section 1(155), as required pursuant to 40 C.F.R. §

268.7(a)(2) and (3) and 401 KAR 37:010, Section 7(1)(a) and (b).

69.     On numerous occasions between 1984 and 1998, the defendants failed to retain

on-site a copy of all notices, certifications, demonstrations, waste analysis data, and other

documentation produced pursuant to 40 C.F.R. § 268.7 and 401 KAR 37:010, Section 7, for

specified time period from the date that the waste that was the subject of such documentation

was last sent for off-site or on-site treatment, storage or disposal, as required pursuant to 40

C.F.R. § 268.7(a)(8) and 401 KAR 37:010, Section 7(g).

70.     Each failure of the defendants to comply with the land disposal restriction

requirements set forth in 40 C.F.R. § 268.7 and 401 KAR 37:010, Section 7, as set forth in

paragraphs 67, 68, or 69 of this Complaint, constitutes a separate violation of 40 C.F.R. § 268.7

and/or 401 KAR 37:010, Section 7.

71.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil

Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended

by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and

61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to

$25,000 per day for each violation of 40 C.F.R. § 268.7 and/or 401 KAR 37:010, Section 7

occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each

violation of 40 C.F.R. § 268.7 and/or  401 KAR 37:010, Section 7 occurring on or after January

31, 1997.

## Count 3 - Failure to Comply with Hazardous Waste Shipment Requirements

72.   Paragraphs 1 through 71are realleged and incorporated herein by reference as though fully set forth herein.

73.   On numerous occasions between 1984 and 1998, the defendants transported or offered for transport hazardous waste to off-site TSD facilities without preparing a proper manifest, or without otherwise complying with all manifest requirements, as prescribed in 40 C.F.R. Part 262, Subpart B, and 401 KAR 32:020.

74.   On numerous occasions between 1984 and 1998, the defendants transported or offered for transport hazardous waste to off-site TSD facilities without properly packaging, labeling, or otherwise preparing the shipment in accordance with all pre-transport requirements as prescribed in 40 C.F.R. Part 262, Subpart C, and 401 KAR 32:030.

75.   On numerous occasions between 1984 and 1998, the defendants failed to prepare and submit biennial or annual reports and exception reports to the appropriate federal and state regulators, and failed to maintain copies of such reports as well as manifests and other records required to be maintained under 40 C.F.R. Part 262 and 401 KAR Chapter 32, as prescribed in 40 C.F.R. Part 262, Subpart C, and 401 KAR 32:040.

76.   Each failure of the defendants to prepare a proper manifest or to otherwise comply with all manifest, pre-transport, and notice and recordkeeping requirements prescribed in 40 C.F.R. Part 262, Subparts B, C, and D, and 401 KAR 32:020, 32:030, and 32:040, as set forth in paragraphs 73, 74 and 75, constitutes a separate violation of 40 C.F.R. Part 262 and/or 401 KAR Chapter 32.

77.   Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended*

20

*by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and

61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to

$25,000 per day for each violation of 40 C.F.R. Part 262, Subpart B, and/or 401 KAR Chapter 32

occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each

violation of 40 C.F.R. Part 262, Subpart B, and/or  401 KAR Chapter 32 occurring on or after

January 31, 1997.

<u>Count 4 - Operating a Hazardous Waste Disposal</u>
<u>Facility Without a Permit or Interim Status</u>

78.     Paragraphs 1 through 77 are realleged and incorporated herein by reference as

though fully set forth herein.

79.     On numerous occasions between 1984 and 1998, the defendants disposed of

hazardous waste, within the meaning of 40 C.F.R. §§ 260.10, 261.3 and 401 KAR 30:005,

Section 1(13); 31:005, Section 1(66); 32:005, Section 1(66); 34:005, Section 1(66); 37:005,

Section 1(66), (118); 38:005, Section 1(66), (118), at the PGDP, including but not limited to the

wastes identified in paragraph 64.

80.     For most or all of the period between 1984 and 1998, the defendants operated a

facility that was used for the disposal of hazardous waste without obtaining a permit, as required

by 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and 401 KAR 38:010, and did not qualify for interim

status pursuant to 42 U.S.C. § 6925(e), 40 C.F.R. Part 270, Subpart G, and 401 KAR 38:020, and

was not otherwise exempt from such permit requirements under any provision of law.

81.     Each day that the defendants operated the PGDP without a permit authorizing the

disposal of hazardous waste at the facility constitutes a separate violation of 42 U.S.C. § 6925(a),

40 C.F.R. Part 270, and 401 KAR 38:010.

82.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil

Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended*

*by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and

61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to

$25,000 per day for each violation of 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and/or 401 KAR

38:010 occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each

violation of 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and/or 401 KAR 38:010 occurring on or

after January 31, 1997.

### Count 5 - Failure to Comply with RCRA Permit Conditions

83.     Paragraphs 1 through 82 are realleged and incorporated herein by reference as

though fully set forth herein.

84.     On or about May 18, 1990, Energy Systems submitted to the State an application

for a RCRA Part B hazardous waste treatment and storage permit for the PGDP, pursuant to 40

C.F.R. Part 270, Subpart B, and 401 KAR Chapter 38.

85.     A RCRA permit for the PGDP ("the Permit") was approved by the State effective

on or about August 19, 1991, authorizing the treatment and storage of hazardous waste at the

PGDP under certain terms and conditions set forth in the Permit.  There have been fifteen

modifications to the Permit since August 19, 1991.

86.     Between 1991 and 1998, the defendants stored hazardous waste in locations or

otherwise in a manner not authorized under Permit condition II.H.

87.     Between 1991 and 1998, the defendants stored hazardous waste in locations or

otherwise in a manner not authorized under Permit condition II.I.

22

88.     On numerous occasions between 1991 and 1998, the defendants stored hazardous waste without first obtaining or performing a general waste analysis and otherwise complying with all requirements set forth under 401 KAR 34:020, Section 4, as required under Permit condition II.B.2.

89.     Between 1991 and 1998, the defendants did not maintain and operate the PGDP in a manner that minimized the possibility of a fire, explosion, or unplanned sudden or non-sudden release of hazardous waste or hazardous constituents to air, soil or surface water which could threaten human health and/or the environment, as required under Permit condition II.C.1.

90.     Between 1991 and 1998, the defendants failed to comply with the recordkeeping and reporting requirements set forth in Permit condition II.F, including but not limited to their failure to maintain records describing the nature and quantity of all hazardous waste at the PGDP and the method and location of storage.

91.     Between 1991 and 1998, the defendants failed to report numerous instances of non-compliance with Permit requirements that might endanger human health or the environment within 2 hours from the time the defendants became aware of the non-compliance, as required under Permit condition III.E.14 (original Permit condition III.E.15).

92.     Between 1991 and 1998, the defendants failed on numerous occasions to report instances of non-compliance with Permit requirements that were not reported under Permit condition III.E.14 (original Permit condition III.E.15) at the time annual reports were submitted to Federal and State regulators, as required under Permit condition III.E.15 (original Permit condition III.E.16).

93.     Between 1991 and 1998, the defendants failed on numerous occasions to report newly identified Solid Waste Management Units, as defined in Permit Part III.D, discovered

during the course of groundwater monitoring, field investigations, environmental audits, or other means, to Federal and/or State regulators, as required under Permit condition IV.B.1.

94.     Each failure of the defendants to comply with a Permit condition at the PGDP constitutes a separate violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1).

95.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1) occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1) occurring on or after January 31, 1997.

## FALSE CLAIMS ACT VIOLATION - 31 U.S.C. § 3729(a)(1) and (a)(2)

### Count 6 - (False Claims Act)

96.     This is a claim by plaintiff United States against defendants for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2). Beginning in 1993 and continuing to 1999, defendants knowingly presented or caused to be presented to officers or employees of the government false and fraudulent claims for payment and approval, and knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the government.

97.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 95, inclusive.

98.    Beginning in 1987 or earlier, DOE had recognized the applicability of RCRA to hazardous and mixed wastes (wastes consisting of a combination of hazardous and radioactive constituents) at DOE's facilities, and required its management and operations contractors to bring its various facilities into compliance with RCRA, and to inform DOE and regulators of non-compliances with RCRA.

99.    On or about February 16, 1990, Energy Systems represented to DOE's Oak Ridge Operations Office ("ORO") that Energy Systems had in place an extensive program of advising the Department of Energy of all instances of actual or potential non-compliance with environmental laws and regulations.  Energy Systems further represented that this was done, not only through oral communications, but also through immediate follow-up written correspondence.  Energy Systems further told DOE that Energy Systems would ensure that the regulators were also notified of such actual or potential non-compliances.

100.    As a purported example of this program of notifying DOE in writing of non-compliances, on or about February 28, 1990, Energy Systems advised ORO that 60 drums of potentially hazardous waste remained uncharacterized, but that with the exception of those drums, all other wastes had been appropriately characterized and stored.  Energy Systems acknowledged that improper storage would be a nonconformance with RCRA.

101.    On or about January 28, 1991, DOE's Contracting Officer for the Paducah contract, at the direction of the Undersecretary of Energy, informed Energy Systems that DOE considered the identification and remediation of environmental compliance problems as matters of the highest priority which Energy Systems was contractually bound to address.  The Contracting Officer further advised Energy Systems that it was DOE's policy that issues of

potential environmental noncompliance should be promptly disclosed and addressed in a compliance agreement with the appropriate regulatory authority.

102.    On or about September 8, 1993, DOE's Manager of the Oak Ridge Operations Office, who was also the Contracting Officer, reiterated to Energy Systems that it was insufficient simply for Energy Systems to notify DOE in writing of environmental non-compliances, but that all such notifications were required to include a corrective action plan appropriate to the circumstances.

103.    On or about April 25, 1994, Energy Systems manager for Environmental Restoration and Waste Management at the PGDP, Jimmy Massey, represented to DOE's Manager of the PGDP facility that "[Energy Systems] views identification and remediation of environmental problems, as well as timely notification, as matters of highest priority to which we are contractually bound . . . ."

104.    Thus, Energy Systems was informed by DOE that it was DOE's policy, established at the highest level of the agency, as well as the express directive of the Contracting Officer, that Energy Systems comply with the environmental laws, including RCRA, that Energy Systems truthfully and fully report all actual and potential RCRA non-compliances to both DOE, and Federal and State regulators, and that notifications of non-compliances were required to be in writing and include a corrective action plan.  Energy Systems also knew that, if any subordinate of the Contracting Officer might purport to waive, excuse, ignore or not enforce these requirements, such subordinate would be acting outside the scope of his or her authority and contrary to the policy of DOE, the express directive of the Contracting Officer, and the terms of the contract.

105.    Following USEC's leasing of certain buildings at the PGDP effective July 1, 1993, DOE, USEC and the defendants agreed that DOE would continue to operate through Energy Systems RCRA storage units at the PGDP, including storage units in USEC-leased buildings.  They further agreed that labor at those units would be provided by Utility Services under the supervision of Energy Services.

106.    At some time between 1984, when it began to operate the PGDP for DOE, and 1998, the exact date being presently unknown to plaintiff, Martin Marietta (and/or its successor, Lockheed Martin) formed an intention to purchase and acquire the uranium enrichment operations at the PGDP from the government.

107.    As of mid-1993, Energy Systems and Utility Services were aware that the USEC uranium enrichment operations at the PGDP might be privatized through a sale to investors or to an existing private corporation within two years.

108.    In or about late 1997 or the first half of 1998, the exact date bring presently unknown to plaintiff, Lockheed Martin began developing its proposal to purchase and acquire the USEC uranium enrichment operations at the PGDP from the government.

109.    In or about May 1998, Lockheed Martin submitted an ultimately unsuccessful proposal to purchase and acquire the USEC uranium enrichment operations at the PGDP from the government.  Certain of the actions by defendants described below resulted in a shifting of environmental liability to DOE from the uranium operations which Lockheed Martin sought to acquire.

110.    (a)    As more particularly described in paragraphs 116-158, below, beginning in the early 1990's, defendants Energy Systems and Utility Services submitted and caused to be submitted false and fraudulent statements, and concealed material information from the

government, regarding the nature, degree, and circumstances of RCRA non-compliances at the PGDP. The defendants' false and fraudulent statements, and material concealments were made knowingly, within the meaning of 31 U.S.C. § 3729(b), to get false claims for costs, award fees, and incentive fees, paid and approved by the government, resulting in monetary damages to the government.

(b)     The defendants' false and fraudulent statements and material concealments fostered a false impression on the part of the government that defendants were doing a good job of implementing RCRA at the PGDP, and that any non-compliances that were discovered at the PGDP were sporadic, minor, and promptly corrected. In reality, defendants knew of substantial non-compliances with RCRA that they failed to report to the government. Those non-compliances included the illegal storage of hazardous wastes in approximately 150 areas known as "Material Storage Areas" or "MSA's," as well as the defendants' failure to make hazardous waste determinations, their failure to comply with land disposal restrictions for hazardous waste, their failure to comply with hazardous waste shipment requirements, their operation of a hazardous waste disposal facility without a permit or interim status, and their failure to comply with RCRA permit conditions, as alleged in paragraphs 50-95, above. Furthermore, defendants knowingly concealed the fact that large quantities of wastes contaminated with trichloroethylene (TCE) from degreasing activities at the PGDP constituted "listed" hazardous wastes. Defendants illegally stored these TCE-contaminated listed wastes in non-RCRA-permitted storage areas including the MSA's, and illegally disposed of these listed wastes in landfills at the PGDP that were not permitted for the disposal of hazardous wastes, including C-404, C-746-S, C-746-T, and C-746-U. Also, by allowing listed wastes to be mixed with environmental media such as soil and water, defendants significantly increased the volume of substances required to be

28

managed pursuant to RCRA, and these hazardous wastes were also illegally stored in non-RCRA-permitted storage areas, and illegally disposed of in the aforementioned landfills at the PGDP.

(c)    The defendants' false and fraudulent statements, and material concealments impeded, obstructed, and interfered with, the regulatory activities of EPA and the State in properly administering RCRA at the PGDP, for example, by concealing from those agencies conditions and circumstances that might have led them to issue notices of violation (NOV's) for violations of RCRA, and/or which might have resulted in the more timely effectuation of corrective action plans for oustanding non-compliances, had they known the truth.  By falsely representing the nature, degree and circumstances of RCRA non-compliances at the PGDP to EPA and the State, defendants influenced the amounts the government paid under contracts with defendants since the government's assessment of their cooperation with the regulatory agencies was a material consideration in the government's determination of the amounts of costs, award fees, and incentive fees to be paid defendants.

(d)    Had the government known the truth regarding defendants' substantial non-compliances with RCRA, and their false reporting and misrepresentations regarding RCRA non-compliances at the PGDP, the government would have paid defendants less in costs, award fees, and incentive fees than the government actually paid.

### Description of the Material Storage Areas (MSA's)

111.   The MSA's were areas inside buildings and outdoors at the PGDP where materials (still useful items such as spare parts, not regulated under RCRA) were intermixed with solid wastes, some of which were hazardous and/or radioactive.  Some MSA's were small, containing perhaps a couple of drums.  Others were large and contained varying combinations of drums,

29

scrap metal, old parts for the enrichment process, electrical equipment, furniture, trucks, chemical tanks, light bulbs, rags, used motor parts, used batteries, used oil, tanks, miscellaneous equipment containing liquids, hydrofluoric acid, and contaminated media generated from remediation activities at the facility.

112.     In December 2000, reports were submitted to the State identifying 147 MSA's as "Solid Waste Management Units" ("SWMU's") within the meaning of RCRA. A summary of those reports is attached to this Complaint as Appendix A, and is hereby incorporated by reference. These SWMU reports identified solid wastes being stored in 138 MSA's.

113.     The defendants stored hazardous wastes without a RCRA permit in the following MSA's: C-310-02, C-331-05, C-331-06, C331-10, C-331-14, C-331-15, C-331-16, C-333-20, C-333-21, C-333-31, C-335-5, C-400-04, C-400-05, C-409-01, C-409-02, OS-3, OS-5, OS-8, OS-9, OS-11, and OS-12. Additional hazardous wastes were stored without a RCRA permit in other MSA's, and elsewhere on the PGDP site, including, for example, the H3 Pad. The hazardous wastes stored illegally included thousands of containers of listed hazardous wastes in regard to which defendants had knowingly failed to make listing determinations, as alleged in paragraph 155, below.

114.     MSA C-400-04 contained RCRA hazardous wastes posing a potential threat of bodily injury and property damage in an area that was not permitted to store hazardous wastes. This MSA contained a deteriorating drum of hydrofluoric acid (HF), a container of "aqua regia" (a combination of two strong acids), a container of nitric acid with neptunium in solution, a cardboard box of sodium hydroxide, and laundry bleach spread out on the floor in powder form.

115.     Beginning in 1992, defendants knew of the presence in the MSA's of RCRA-regulated solid wastes, some of which were hazardous, based upon their activities in 1992-93

30

and thereafter in filling out Requests for Disposal ("RFD's") for many of the items in the MSA's,
their frequent utilization of the buildings and outside areas where the MSA's were located, their
numerous walk-downs and inspections of the MSA's themselves, and their Rad Area Reduction
Project ("RARP") which is described more fully in paragraphs 116-120, below.

### Defendants' False and Fraudulent Conduct With Respect To The Radiation Area Reduction Project (RARP)

116.    Defendants conducted the RARP from late 1994 through approximately October
1996.  This project was an effort to consolidate and relocate the contents of the MSA's in such a
way as to reduce the total floor space taken up by the MSA's in various buildings at the PGDP
including the four large process buildings, C-331, C-333, C-335, and C-337.  Defendants' work
with the contents of the MSA's for a period of two years gave defendants a close and detailed
familiarity with the wastes, including the hazardous wastes, located therein.

117.    Defendants gained government approval of the RARP, *inter alia*, based on the
government's understanding, induced by defendants' representations, that ongoing
characterization of the items in the MSA's would be an important part of the project scope.
When Utility Services employees commenced the project, under the supervision of Energy
Systems, they inventoried each item and characterized it for radiation prior to packing it into
large containers called "B-25 boxes" or moving it to a new location.  This was a necessary safety
measure to avoid creating new nuclear criticality safety concerns with respect to the more
compact MSA's into which Utility Services was relocating the items.

118.    One implication, if Utility Services were to create new nuclear criticality safety
concerns in the new, more compact MSA's, would be that it would be more expensive for DOE
in the future to process and dispose of items in the MSA's inasmuch as those items could not be

31

processed and stored without taking more complicated and expensive nuclear criticality safety

precautions.  In fact, in late 1994, defendants knew that the failure to radioactively characterize

items before consolidating and moving them would impose upon DOE higher costs of

characterization later.

119.    Based upon defendants' representations, the government had an expectation that

items would be characterized as they were being consolidated and relocated.

120.    However, during 1995, the exact date being presently unknown to plaintiff,

without informing the government, defendants abandoned the ongoing inventorying and

characterization of items as they were being consolidated and located.  This has resulted in a

substantial increase in the costs to DOE of processing and disposing of the contents of the

MSA's, which increase in costs DOE would not have had to incur had defendants carried out the

RARP in accordance with the representations they made to the government to induce the

government to approve of the payment of government funds to finance the RARP.

### Defendants' False and Fraudulent Statements Regarding
### The MSA's, RCRA Non-Compliances, and Listed Wastes

121.    Beginning in the early 1990's and continuing through April 1998, defendants

submitted statements to DOE, EPA, the State and others that were false or fraudulent by reason

of their failure to disclose the presence in the MSA's of hazardous wastes, their failure to

disclose the listed nature of certain hazardous wastes including wastes contaminated with spent

TCE, and their failure to disclose that defendants: had not made hazardous waste determinations,

had not complied with land disposal restrictions for hazardous wastes, had failed to comply with

hazardous waste shipment requirements, had operated a hazardous waste disposal facility

without a permit or interim status, and had not complied with RCRA permit conditions, as

32

alleged in paragraphs 50-95, above.  Defendants made these statements with actual knowledge of the falsity of their statements, or with reckless disregard of whether their statements were true or false, or with deliberate ignorance of whether their statements were true or false.  Defendants knew that regulators' discovery of the unreported RCRA non-compliances could lead to the reduction of the payments they were receiving from the government under their government contracts.  Defendants' false and fraudulents statements included, but were not limited to, those described below.

122.    In Environmental Reports in 1990, 1991, and 1992, defendants falsely and fraudulently stated that the C-746-S and C-746-T landfills were used for disposal of sanitary trash and nonhazardous wastes, which statements were false and fraudulent inasmuch as defendants knew that mixed and hazardous wastes had been disposed of in those landfills.

123.    In a December 7, 1992 memorandum, an MMES employee stated that the PGDP contained a large amount of inactive process equipment that could contain RCRA hazardous wastes, and that the areas where the equipment was stored could be considered to be storing hazardous wastes without a RCRA permit, resulting in the issuance of NOV's by regulators.

124.    In a 1994 Environmental Report, defendants falsely and fraudulently stated "[t]he Paducah site is in compliance with the requirements of [DOE Order 5400.1] through implementation of the regulatory requirements of . . . RCRA . . . , and other federal and state environmental statutes."  This representation was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

125.    The annual report for calendar year 1994, which defendants prepared and caused to be submitted to government was false and fraudulent inasmuch as it failed to disclose the

33

RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

126.    The annual report for calendar year 1995, which defendants prepared and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

127.    During 1995, USEC and DOE began to discuss a proposal to have DOE "de-lease" the MSA's from USEC so as to facilitiate the Nuclear Regulatory Commission's ("NRC's") issuance to USEC of a license to operate the uranium enrichment facilities.

128.    On December 22, 1995, defendants prepared and caused to be submitted a report to DOE, which DOE in turn transmitted to the NRC, entitled "DOE Stored Materials at GDP Leased Facilities."  This report purported to identify the kinds, amounts and locations of the items DOE was storing in USEC-leased facilities at the PGDP based on a survey conducted by the defendants.  This report was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

129.    On April 23-24, 1996, the Energy Systems Environmental Compliance organization from Energy Systems' Oak Ridge, Tennessee headquarters, assessed the compliance status of the contents of the MSA's in the process buildings at the PGDP.  This environmental compliance assessment was performed at the request of DOE due to DOE's concerns that movement of items in the MSA's during the RARP may have created some environmental non-compliances of which DOE wanted to be apprised prior to deciding to de-lease the MSA's from USEC.

130.    The report issued by Energy Systems falsely and fraudulently stated that "There is no DOE RCRA-hazardous or mixed waste stored on USEC-leased space."  This report was also false and fraudulent inasmuch as it failed to disclose that defendants had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above, and for the further reasons described in paragraph 121, above.

131.    On May 28, 1996, based on the foregoing false and fraudulent representations, DOE entered into an agreement with USEC to de-lease the MSA's.

132.    In or about September 1996, Energy Systems submitted to DOE a "Self-Assessment Report" regarding environmental management at the PGDP.  This report was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above, and because it failed to disclose that defendants had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above.

133.    In December 1996, on the eve of DOE's execution of the final documents accepted the de-leasing of the MSA's from USEC, defendants began to disclose to DOE's site manager at the PGDP less than the full information known to them regarding environmental non-compliances in the MSA's. Their statements to the DOE site manager constituted false and fraudulent half-truths inasmuch as defendants acknowledged only that there "might be" "possible environmental non-compliances" due to the presence in the MSA's of containers of "unknown" or "unidentified" substances or of "miscellaneous equipment," when, as defendants knew, there were actual, long-existing, substantial RCRA non-compliances in those areas.

35

134.    With respect to MSA 400-04, for example, defendants stated that the MSA contained "unidentified materials in containers [that] could be hazardous," when, in fact, as defendants knew, that DMSA contained in illegal storage RCRA-regulated hazardous chemicals posing a risk of bodily injury and property damage, including a container of hyrdofluoric acid with a label stating: "Hydrofluoric Acid.  Corrosive Material.  Danger!  Hazardous Liquid and Vapor Causes Severe Burns."  Defendants' statements were also false and fraudulent inasmuch as defendants failed to disclose that they had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above, and the other non-compliances described in paragraph 121, above.

135.    After being presented with these false and fraudulent half-truths, DOE's site manager agreed to final acceptance of the MSA's, and the MSA's were transferred back to DOE under the lease agreement between it and USEC.

136.    The annual report for calendar year 1996, which Energy Systems prepared with Utility Services' assistance and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

137.    In a May 12, 1997 memorandum, Energy Systems' manager at the PGDP, Jimmy Massey, acknowledged that wastes and equipment containing fluids had been placed in the MSA's in likely non-compliance with State/EPA regulations.  Massey stated: "I will not warrant that the [MSA's] are 'clean' because I know they are not."

138.    In an August 14, 1997 memorandum, an Energy Systems employee wrote that "[e]nvironmental noncompliances are a significant concern [in the MSA's].  A state regulator is expected to inspect the PGDP by Sept[ember] 30, 1997.  NOV's and fines could be issued based upon his findings."

139.    In or about October 1997, defendants prepared and caused to be submitted a report to Congress which falsely and fraudulently stated "[o]ver the past four years, DOE activities at PGDP have been in compliance with [all environmental] permits with the following exceptions."  The non-compliances described herein were not among the exceptions disclosed.

140.    In a November 11, 1997 memorandum to Steve Polston, the manager for Utility Services at the PGDP, Jimmy Massey warned that each company was in a position to cause its sister company to be subject to serious consequences from enforcement actions by regulators due to the wastes in the MSA's.

141.    The annual report for calendar year 1997, which Energy Systems prepared with Utility Services' assistance and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

142.    In a January 31, 1998 email, Jimmy Massey wrote that "[t]here are LMES contract performance impacts and fee at risk" if LMES were held accountable for the MSA problems.

143.    In early 1998, Bechtel Jacobs Company (BJC) was conducting due diligence at the PGDP with a view toward taking over as DOE's contractor in April 1998, when Energy Systems' contract expired.  On January 26, 1998, Energy Systems' manager at the PGDP, Jimmy

37

Massey, advised BJC representatives that "steps necessary to ensure environmental compliance [with respect to the MSA's] have not been taken."

144.    In a letter dated June 12, 1998, Mr. Massey falsely and fraudulently stated to DOE that the MSA's "do not currently represent a noncompliant situation and do not require cost and schedule for corrective action to resolve the potential for uncharacterized materials."  Mr. Massey further stated that tasks regarding the MSA's were being performed with "the assumption that hazardous materials are not contained in these areas . . . . "

145.    In a "Key Issues Summary" dated August 29, 1999, Jimmy Massey admitted that state regulators had not been informed about the MSA's.

146.    Meanwhile, beginning in 1986 or earlier, Energy Systems knew that TCE was used at PGDP almost exclusively to degrease equipment and therefore that virtually all TCE contamination at the site was traceable to a source that rendered the TCE a listed hazardous waste, as opposed to a characteristic hazardous waste.  In a January 24, 1989 document, for example, an Energy Systems waste manager stated: "Trichloroethylene is and has been used at PGDP exclusively for degreasing and is therefore a listed hazardous waste (F001)."  He further stated that the groundwater at the site "contains [TCE and therefore] is a listed hazardous waste."

147.    Beginning no later than 1988, it was known that groundwater "plumes" flowing underground in several directions from the PGDP site contained TCE.  Energy Systems had sufficient information to have determined at that time that groundwater contaminated with TCE was a listed hazardous waste.  However, Energy Systems continued to identify the groundwater plumes as merely characteristic on the ground that Energy Systems lacked sufficient information to know that the TCE infiltrating the groundwater had come from degreasing activities, when, in fact, it knew that TCE was used almost exclusively for degreasing.  The implication was that

groundwater and soil samples obtained through hundreds of monitoring wells at PGDP could be stored and disposed of in non-RCRA permitted units and landfills and other facilities, when in fact such storage and disposal violated RCRA.

148.    In 1990, DOE specifically inquired of Energy Systems whether liquids and sludge in a facility known as the "C-403 neutralization pit" might be listed due to the presence of TCE. After preparing a series of internal analyses concluding that "neut pit" contents were in fact listed, Energy Systems sent DOE a formal letter response falsely and fraudulently stating the opposite conclusion.

149.    In its formal letter response, Energy Systems suggested to DOE that the only TCE getting into the neut pit resulted from "drippings" of TCE falling off of uranium enrichment condensers, automobile-sized pieces of enrichment equipment, that were held by cranes in building 400 to be degreased by TCE vapors from the large degreasing tank.  However, Energy Systems knew that as much as 25 gallons of TCE would condense inside of the bends and nodules of the pipe-like condensers and come spilling out of the condensers when they were placed on the floor next to the tank. That TCE would run down the floor drain adjacent to the tank and through piping into the neut pit.  The Energy Systems employees who prepared the formal letter response to DOE interviewed building 400 employees involved in degreasing, and thus were aware that the quantities of TCE from degreasing flowing into the neut pit were large, rather than simply constituting "drippings" as they were falsely described in the letter.

150.    Energy Systems' internal analyses also pointed out several other pathways through which TCE was flowing into the neut pit besides the floor drain next to the large degreaser tank.  However, the letter to DOE omitted any reference to these various pathways,

and, as already noted, suggested that the only source of TCE to the neut pit was drippings off the condensers.

151.    By thus "sanitizing" the information it passed along to DOE, Energy Systems falsely and fraudulently portrayed the neut pit TCE as fitting within an exception EPA had carved out to the requirement that TCE from degreasing be deemed a listed hazardous waste. This EPA guidance stated that *de minimis* drips of TCE from degreased ball bearings was not a listed waste.  In the letter, Energy Systems represented to DOE that the TCE infiltrating the neut pit came exclusively from drippings comparable to the ball bearing situation, when, in fact, Energy Systems knew, but omitted to tell DOE, that there were a variety of pathways of TCE to the neut pit and that the flows were considerably more substantial than drops from ball bearings.

152.    In a report to Energy Systems dated February 1, 1993, one of Energy Systems' subcontractors, Science Applications International Corporation("SAIC") informed Energy Systems that "[i]f groundwater contamination at the PGDP can be attributed to a source that has [been] managed or is currently [being] manag[ed] [as] a listed waste the groundwater must be treated as the listed waste until the waste is removed."  The report further stated:

> [T]he information available to date, including the Phase II investigation and the groundwater study you provided, would clearly constitute "available site information" or "some information" showing that the TCE is either F001, F002 or U228 listed hazardous wastes or both.

The report concluded:

> This is an exceedingly complicated scenario with significant criminal, civil and operational implications if it is not handled correctly.  We recommend express regulatory approval of any conclusions made that TCE is not a listed waste but is merely characteristic.  Even though express approval would likely not be a total defense to future regulatory enforcement action . . . , it would be on a far higher plane for defense purposes than mere tacit

40

> approval –such as by discussing this in a CERCLA
> workplan–would be. . . . We recommend that the regulators be
> directly approached with this proposal and fully briefed on its
> implications and the issues involved before the facility takes
> definitive action. (emphasis in original)

153.    In meetings during 1994, and continuing throughout the remainder of its tenure as

DOE's contractor at the PGDP, without disclosing fully the information known to it, Energy

Systems falsely and fraudulently represented to DOE that groundwater plumes, personal

protective equipment contaminated with TCE, and soil and water contaminated by TCE be

treated as characteristically hazardous only, not as listed, due to an absence of sufficient

information showing that the TCE in question was from degreasing.

154.    As a result of its misrepresentations and false statement regarding TCE,

throughout the 1990's, Energy Systems illegally and in violation of RCRA stored listed

hazardous wastes in various locations at the PGDP including in the MSA's, illegally and in

violation of RCRA treated hazardous wastes at various locations at the PGDP including

buildings C-400 and C-752, and disposed of RCRA listed hazardous wastes in landfills at the

PGDP and other disposal sites, resulting in the recent issuance by regulators to DOE of Notices

of Violation.

155.    Additionally, during the 1990's, Energy Systems failed to properly evaluate

thousands of containers of waste to determine whether they constituted listed hazardous wastes,

despite the fact that some of its employees internally advised Energy Systems that a

determination whether the contents were listed was a threshhold requirement that should be

accomplished prior to conducting so-called "Toxic Characteristic Leaching Procedures" (TCLP)

testing to assess whether the contents were hazardous by characteristic.  Instead, Energy Systems

knowingly skipped over making a listing determination and proceeded directly to conduct

41

expensive TCLP testing.  As a result, DOE has recently concluded that thousands of containers

of wastes at the PGDP will need to be re-evaluated to determine if they are in fact listed wastes,

and some of the containers that should have been listed were illegally and in violation of RCRA

stored in non-RCRA permitted storage and/or disposed of in landfills and other sites not

permitted to receive RCRA-hazardous wastes.

156.    By reason of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1),

defendants knowingly presented, and caused to be presented, to an officer and employee of the

United States government false and fraudulent claims for payment and approval, to wit, its

various requests and demands, under its contract and otherwise, for money or property of the

United States in the form of payments of costs, award fees, and incentive fees, as further

described in paragraph 158, below.

157.    Furthermore, by reason of the foregoing conduct, and in violation of 31 U.S.C. §

3729(a)(2), defendants knowingly made, used, and caused to be made and used false records and

statements to get false and fraudulent claims paid and approved by the government, to wit,

claims for costs, award fees and incentive fees, as further described in paragraph 158, below.

Defendants' false records and statements included, *inter alia*, the various false and fraudulent

documents, statements, representations, concealments, and omissions described above.

158.    By reason of defendants' violations of the False Claims Act, the United States was

damaged because it paid more in costs, award fees, and incentive fees, than it would have paid

had it known the truth.  The claims paid by, and the damages suffered by, the United States were

as follows:

(a)    From time to time, the government has paid various claims for government funds

through bank accounts upon which defendants drew in paying the costs of managing and

operating the PGDP.  These include costs of implementing RCRA-compliant waste management and environmental restoration programs, costs of preparing and submitting annual reports and other documents described above, costs of the RARP, costs of characterizing wastes, and costs of cleaning up the MSA's.  By reason of defendants' false and fraudulent statements, claims and conduct as alleged above, the government has paid more in costs than it otherwise would have paid, had the government known the truth; and will continue to incur more in costs in connection with cleaning up the MSA's, making listed waste determinations on thousands of containers at the PGDP, and testing and remediating the landfills at the PGDP, than it otherwise would have been required to pay, had the government known the truth.

     (b)     By reason of defendants' false and fraudulent statements, claims and conduct as alleged above, the government paid defendants more in award fees and incentive fees for contract performance than it otherwise would have paid, had the government known the truth. The estimated award fees actually paid to Energy Systems were approximately as follows:

| Fiscal Year | Amount |
| --- | --- |
| 1994 | $10,825,913 |
| 1995 | $11,949,077 |
| 1996 | $38,425,340 |
| 1997 | $17,088,000 |
| 1998 (part of year) | Figure not available at this time |

The estimated performance-based incentive fees actually paid to Energy Systems were approximately as follows:

| Fiscal Year | Amount |
| --- | --- |
| 1996 | $ 5,987,000 |

43

| | |
|---|---|
| 1997 | $ 6,152,500 |
| 1998 (part of year) | Figure not available at this time |

The estimated incentive fees actually paid to Utility Services were approximately as follows:

| Fiscal Year | Amount |
|---|---|
| 1994 | $ 1,500,000 |
| 1995 | $ 4,289,652 |
| 1996 | $ 3,929,465 |
| 1997 | $ 3,112,889 |
| 1998 | Figure not available at this time |
| 1999 (part of year) | Figure not available at this time |

159.     Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

## COMMON LAW CLAIMS

### Count 7 - (Breach of Contract)

160.     This is a claim by Plaintiff United States against defendants for breach of contract.

161.     Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 159, inclusive.

162.     By reason of the acts set forth above, defendants breached their contracts with the United States for the management and operation of the PGDP including those provisions of the contracts described above.

44

163.    By reason of defendants' breaches of contract, the United States sustained damages consisting of the payments described in paragraph 158, above.

164.    Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

### Count 8 - (Payment under Mistake of Fact)

165.    This is an alternative claim to the breach of contract claim by plaintiff United States against defendants, for payment under mistake of fact.

166.    Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 164, inclusive.

167.    The United States made payments to defendants under the contracts in the mistaken belief that defendants were fully performing their contracts. Such payments were made by mistake of fact and were not authorized by law.

168.    As a result of such mistaken and unauthorized payments, the United States sustained damages.

169.    Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

### Count 9 - (Unjust Enrichment)

170.    This is an alternative claim by plaintiff United States against defendants, for payment by mistake of fact.

171.    Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 169, inclusive.

172.    Plaintiff paid to defendants monies by which, as a result of the facts and circumstances stated above, defendants have been unjustly enriched at the expense of the United States.

173.    By reason of these payments, plaintiff is entitled to the return of the amount by which defendant has been unjustly enriched.

174.    Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

## PRAYER

WHEREFORE, plaintiff United States prays for judgment against the defendants, jointly and severally, as follows:

A.    As to Counts 1- 5, for civil penalties against the defendants in the amount of $25,000 per day for each violation of the applicable RCRA statutes, rules and regulations governing the management of hazardous waste occurring prior to January 31, 1997, and in the amount of $27,500 per day for each violation of the applicable RCRA statutes, rules and regulations governing the management of hazardous waste occurring on or after January 31, 1997, as alleged in Counts 1 through 5, plus post-judgment interest, attorneys fees and costs;

B.    As to Count 6, under the False Claims Act, for treble the damages sustained by the United States, which also include investigative costs, and which will be proven at trial, plus

civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation, post-judgment interest, and attorneys fees and costs;

      C.      As to the Count 7, breach of contract, against defendants in the amount equal to the damages suffered by the United States, plus pre-judgment and post-judgment interest, and costs;

      D.      As to the Count 8, payment under mistake, for the sums mistakenly paid by the United States, which will be proven at trial, and for pre-judgment and post-judgment interest, and costs;

      E.      As to the Count 9, unjust enrichment, for the sums by which defendants have been unjustly enriched, which will be proven at trial. plus pre-judgment and post-judgment interest, and costs;

      Plaintiffs United States also prays for:

      F.      Such other relief as this Court may deem just and proper, together with interest and costs.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MONICA WHEATLEY
Acting United States Attorney


WILLIAM F. CAMPBELL
Assistant U.S. Attorney
510 W. Broadway, 10th Floor
Louisville, Kentucky  40202
(502) 582-6773


MICHAEL F. HERTZ
STEPHEN D. ALTMAN
JOHN A. KOLAR
DONALD J. WILLIAMSON
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-9301

WILLIAM WEINISCHKE
STEVEN A. KELLER
Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 514-4592

Attorneys for the United States

48

OF COUNSEL:

Frank S. Ney
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, SW
Atlanta, Georgia  30303
(404) 562-9532