## SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the following entities, through their respective authorized representatives:

- ➤ The United States of America, acting through the United States Department of Justice and on behalf of the United States Department of Energy and the United States Environmental Protection Agency (collectively, the United States);

- ➤ The Natural Resources Defense Council, Inc., Thomas B. Cochran, Ronald B. Fowler, Charles F. Deuschle, Susan Jenkins, as Administrator of the Estate of Garland E. Jenkins, and John David Tillson (collectively, the Relators); and

- ➤ Lockheed Martin Corporation and its predecessor, Martin Marietta Corporation (collectively, Lockheed Martin Corporation); Lockheed Martin Energy Systems, Inc. and its predecessor, Martin Marietta Energy Systems, Inc. (collectively, Energy Systems); and Lockheed Martin Utility Services, Inc. and its predecessor, Martin Marietta Utility Services, Inc. (collectively, Utility Services).  (Lockheed Martin Corporation, Energy Systems and Utility Services are hereinafter referred to, collectively, as the Defendants.)

The United States, the Relators, and the Defendants are hereinafter referred to, collectively, as the Parties.

## RECITALS

A.      Energy Systems and Utility Services operated the Paducah Gaseous Diffusion Plant (PGDP) at different and various times between April 1, 1984 and May 1, 1999.  Beginning on April 1, 1984, Energy Systems operated the PGDP under contract

with the U.S. Department of Energy (the DOE).  The PGDP is a uranium enrichment facility in western Kentucky.  In October 1992, Congress created the United States Enrichment Corporation (USEC) for purposes of privatizing the United States' uranium enrichment enterprise.  Effective July 1, 1993, the DOE leased the PGDP's production facilities to USEC, with the rest of the PGDP still owned and controlled by the DOE. From July 1, 1993 to May 1999, Utility Services operated the PGDP's production facilities under contract with USEC.  During that time, Utility Services was responsible for the uranium enrichment operations at the PGDP.  After July 1, 1993, Energy Systems continued to work at the PGDP under contract with the DOE until April of 1998, but shifted its focus to environmental restoration, waste management, and PGDP site custodial care.  Energy Systems also assumed certain responsibilities for facilities at the PGDP not directly related to the operation of the enrichment facility.

B.      The United States represents that, in concert with its current contractors, it continues to remediate contamination at and near the PGDP pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675.

C.      On June 1, 1999, Relators Natural Resources Defense Council, Inc. (NRDC), Thomas B. Cochran, Ronald B. Fowler, Charles F. Deuschle, and Garland E. Jenkins (collectively, NRDC Relators) commenced a civil action in the United States District Court for the Western District of Kentucky, styled *United States of America ex rel. Natural Resources Defense Council, Inc., Thomas B. Cochran, Ronald B. Fowler, Charles F. Deuschle, and Garland E. Jenkins v. Lockheed Martin Corporation, Lockheed Martin Energy Systems, Inc., Martin Marietta Corporation, and Martin Marietta Energy*

2

*Systems, Inc.*, Civil Action No. 5:99-CV-170-M (hereinafter, the NRDC *Qui Tam* Action), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).

D.      On February 9, 2000, John David Tillson (Tillson) commenced a civil action in the United States District Court for the Western District of Kentucky, styled *United States ex rel. John David Tillson v. Lockheed Martin Energy Systems, Inc. and Martin Marietta Energy Systems, Inc.*, Civil Action No. 5:00-CV-39-M (hereinafter, the Tillson *Qui Tam* Action), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).

E.      On May 30, 2003, the United States partially intervened in both the NRDC *Qui Tam* Action and the Tillson *Qui Tam* Action.  On August 28, 2003, the United States filed an Amended Complaint in each of the *qui tam* actions.  (The Amended Complaint in the NRDC *Qui Tam* Action is attached as Exhibit A.  The Amended Complaint in the Tillson *Qui Tam* Action is identical except for the caption.)  After the United States' partial intervention, Relators filed a Third Amended Complaint mirroring the claims in the United States' Amended Complaints.

F.      The United States' Amended Complaints allege that the Defendants violated the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901-6992 (Counts 1-5), and the False Claims Act, 31 U.S.C. §§ 3279-3733 (Count 6), and further allege breach of contract (Count 7), payment by mistake (Count 8), and unjust enrichment (Count 9).  The conduct alleged in the United States' Amended Complaints is referred to below as the Covered Conduct.

G.      On September 29, 2004, the Court consolidated the NRDC *Qui Tam* Action and the Tillson *Qui Tam* Action.  The consolidated action is styled *United States*

*of America ex rel. National Resource Defense Council, et al. v. Lockheed Martin Corporation, et al.*, U.S. District Court for the Western District of Kentucky, Civil Action No. 5:99CV00170-M (subsequently re-designated as Civil Action No. 5:99CV00170-GNS) (hereinafter, the Civil Action).

H.     On October 15, 2015, Susan Jenkins was appointed Administrator of the Estate of Garland E. Jenkins, deceased.  On October 22, 2015, the U.S. District Court for the Western District of Kentucky ordered that Susan Jenkins be substituted in this case for Garland E. Jenkins.

I.     The Parties agree that the U.S. District Court for the Western District of Kentucky has subject matter jurisdiction over the claims asserted by the United States pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 6928 of RCRA, 42 U.S.C. § 6928, and personal jurisdiction over each of the Defendants.  Venue in the Civil Action properly lies in the Western District of Kentucky pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because the conduct alleged in the Amended Complaint occurred in, and the PGDP is located in, that district.

J.     This Agreement is neither an admission of liability by the Defendants nor a concession by the United States or the Relators that their claims are not well-founded. Defendants deny the allegations in the United States' Amended Complaints, as well as all allegations asserted by Relators' Complaints in the Civil Action.

K.     The Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the False Claims Act proceeds of this Agreement and to Relators' reasonable expenses, attorneys' fees and costs.

4

To avoid the delay, uncertainty, inconvenience and expense of additional litigation of the above-referenced claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.  a.   The Defendants shall pay to the United States five million dollars ($5,000,000.00) (the Settlement Amount), no later than 10 business days after the Effective Date of this Agreement (as defined in Paragraph 26 below), by electronic funds transfer, pursuant to written instructions to be provided by the United States to the undersigned counsel for the Defendants.  The Settlement Amount is allocated as follows:

> (i)  Five hundred thousand dollars ($500,000.00) shall be paid by Energy Systems as a civil penalty under RCRA.

> (ii) Five hundred thousand dollars ($500,000.00) shall be paid by Utility Services as a civil penalty under RCRA.

(iii)   Four million dollars ($4,000,000.00) shall be paid in consideration of the United States' release of claims against the Defendants in Paragraph 6, below, and the Relators' release of claims against the Defendants in paragraph 8, below.

b.   At the time of payment, the Defendants shall send evidence of the transfer, together with a transmittal letter referencing the payment, the Civil Action number (No. 5:99CV00170-GNS (W.D. Ky.)), and USAO case number (USAO 90-7-1-07401/1), to the following:

Joan Redleaf Durbin
Senior Attorney
Office of Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, SW
Atlanta, GA 30303

Chief, Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

Deborah Gitin
Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
301 Howard St., Suite 1050
San Francisco, CA 94105

William F. Campbell
Assistant U.S. Attorney
Office of the U.S. Attorney
for the Western District of Kentucky
717 West Broadway
Louisville, KY 40202

c.    If any portion of the RCRA civil penalty payable to the United States

under Paragraphs 1(a)(i) and 1(a)(ii) is not paid when due, the United States may issue a

written demand for payment of stipulated penalties.  Defendants shall, within 30 days of

receipt of such written demand, pay a stipulated penalty to the United States of five

thousand dollars ($5,000.00) a day for each day the civil penalty was late: that is, each

day that elapsed between the due date for the RCRA civil penalty and the date on which

the civil penalty was paid in full.  Along with the stipulated penalty, Defendants shall

also make a payment of interest on the total civil penalty described in Paragraph 1(a)(i)

and Paragraph 1(a)(ii), running from the due date of the penalty to the date it was paid in

full, at the interest rate specified in 28 U.S.C. § 1961.  The United States, in its sole and

unreviewable discretion, may reduce or waive any stipulated penalties otherwise payable under this paragraph.  No Defendant shall deduct the RCRA civil penalty paid under Paragraph 1(a)(i) or Paragraph 1(a)(ii) or any stipulated penalties or interest paid under this Paragraph 1(c) in calculating its federal or state income tax.

2.      Conditioned upon the United States receiving payment of the portion of the Settlement Amount described in Paragraph 1(a)(iii) from the Defendants, the United States agrees that it shall pay to the Relators, by electronic funds transfer, 23 percent of this $4 million ($920,000.00) as soon as feasible after the United States' receipt of the payment from the Defendants.

3.      Contemporaneous with and in consideration for the execution of this Agreement, the Defendants, Relators, and counsel for Relators shall execute the agreement attached hereto as Exhibit B, the terms of which are incorporated herein. Exhibit B resolves all claims and issues concerning the Relators' and counsel for Relators' entitlement to reimbursement of attorneys' fees, costs, and expenses.

4.      Grant & Eisenhofer P.A. shall be responsible for dividing and distributing the payments among Relators and Relators' counsel, and Defendants and the United States have no responsibility for any disputes that may arise regarding the division or distribution of such payments.  The undersigned counsel, James Sabella, Esq. and Grant & Eisenhofer, P.A., specifically represent and warrant that they are fully authorized to divide and distribute the payments on behalf of all Relators and Relators' counsel.

5.      Conditioned on the Defendants' full payment of the Settlement Amount in Paragraph 1 above, and subject to the exceptions in Paragraphs 7 and 10 below, this Agreement shall constitute full settlement of the civil claims of the United States alleged

7

in Counts 1 through 5 of the Amended Complaints against the Defendants through the Effective Date of this Agreement; and shall also constitute full settlement of those same civil claims through the Effective Date of this Agreement against Defendants' current and former parent corporations, direct and indirect subsidiaries, brother or sister corporations, divisions, current or former corporate owners, and the corporate successors and assigns of any of them, but only to the extent that the liability of such corporations, subsidiaries, divisions, owners, successors, or assigns stems from their relationship with Defendants, and does not arise out of their own independent conduct.

6.    Conditioned on the Defendants' full payment of the Settlement Amount in Paragraph 1 above, and subject to the exceptions in Paragraphs 7 and 10 below, the United States releases the Defendants, together with their current and former parent corporations, direct and indirect subsidiaries, brother or sister corporations, divisions, current or former corporate owners, and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has asserted, could have asserted, or may assert in the future for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and the common law theories of breach of contract, payment by mistake, and unjust enrichment.

7.    Notwithstanding Paragraphs 5 and 6 above, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

8

b.  Any criminal liability;

c.  Except as explicitly stated in this Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.  Any liability based on obligations created by this Agreement;

f.  Any liability of individuals; or

g.  Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

8.  Conditioned on the Defendants' full payment of the Settlement Amount in Paragraph 1, the Relators, for themselves and for their respective heirs, successors, attorneys, agents, and assigns, release the Defendants, together with their current and former parent corporations, direct and indirect subsidiaries, brother or sister corporations, divisions, current or former corporate owners, and the corporate successors and assigns of any of them, from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct and from any liability to the Relators arising from or related to the Civil Action, including but not limited to any non-intervened claims asserted in the NRDC Qui Tam Action and the Tillson Qui Tam Action under the False Claims Act, 31 U.S.C. §§ 3729-3733.

9.  The Relators and their respective heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C.

§ 3730(c)(2)(B).  Conditioned upon the Relators' receipt of the payment described in Paragraph 2, the Relators and their respective heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

10.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Agreement, except as expressly stated in Paragraph 5.  This Agreement shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under RCRA or implementing regulations, or under other federal, state, or local laws, regulations, or permit conditions, except as expressly stated in Paragraph 5.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the PGDP.

11.     The Defendants waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.  Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the portion of the Settlement Amount identified in Paragraph 1(a)(iii) for purposes of the Internal Revenue law, Title 26 of the United States Code.

12.     The Defendants fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the Defendants have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

13.     Defendants and their predecessors, successors, assigns, businesses, affiliates, subsidiaries, divisions, parent or sister companies, conservators, employees, agents, counsel, representatives, officers, directors and shareholders release Relators and Relators' Counsel and for their  predecessors, heirs, successors, attorneys, former attorneys,  agents, partners, former partners, and assigns from any and all claims arising out of or relating to the Covered Conduct and the non-intervened claims asserted in the NRDC Qui Tam Action and the Tillson Qui Tam Action.

14.     a.     Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of the Defendants, and their present or former officers, directors, employees, shareholders, and agents in connection with:

(i)     the matters covered by this Agreement;

(ii)     the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

(iii)     the Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and

any criminal investigation(s) in connection with the matters

covered by this Agreement (including attorneys' fees);

(iv)    the negotiation and performance of this Agreement; and

(v)    the payments the Defendants make to the United States pursuant to

this Agreement and any payments that the Defendants may make

to Relators, including costs and attorneys' fees, are unallowable

costs for government contracting purposes (hereinafter referred to

as Unallowable Costs).

b.    Future Treatment of Unallowable Costs:  Unallowable Costs will

be separately determined and accounted for by the Defendants, and the Defendants shall

not charge such Unallowable Costs directly or indirectly to any contract with the United

States.

c.    Treatment of Unallowable Costs Previously Submitted for

Payment:  Within 90 days after the Effective Date of this Agreement, the Defendants

shall identify and repay by adjustment to future claims for payment or otherwise any

Unallowable Costs included in payments previously sought by the Defendants or any of

their subsidiaries or affiliates from the United States.  The Defendants agree that the

United States, at a minimum, shall be entitled to recoup from the Defendants any

overpayment plus applicable interest and penalties as a result of the inclusion of such

Unallowable Costs on previously-submitted requests for payment.  The United States,

including the Department of Justice and/or the affected agencies, reserves its rights to

audit, examine, or re-examine the Defendants' books and records and to disagree with

any calculations submitted by the Defendants or any of their subsidiaries or affiliates

12

regarding any Unallowable Costs included in payments previously sought by the Defendants, or the effect of any such Unallowable Costs on the amount of such payments.

15.     This Agreement is intended to be for the benefit of the Parties only.

16.     Upon receipt of the payment described in Paragraph 1 above and the execution and performance of the separate agreement attached hereto as Exhibit B, the Parties shall promptly sign and file in the Civil Action an Agreed Motion to Dismiss Case as Settled in accordance with Federal Rule of Civil Procedure 41(a), dismissing all claims asserted in the Civil Action in accordance with the terms of this Agreement.  The Agreed Motion will also state that Defendants withdraw their motions asserting that Relators are not proper relators in the Civil Action or should be dismissed from the Civil Action.

17.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement, except as provided in the separate agreement attached hereto as Exhibit B concerning Relators' expenses, costs and attorneys' fees.

18.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

19.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Western District of Kentucky.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and, therefore, shall not be construed against any Party for that reason in any subsequent dispute.

20.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended, except by written consent of the Parties.

21.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

22.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

23.     This Agreement is binding on the Defendants' successors, transferees, and assigns.

24.     This Agreement is binding on the Relators' respective successors, transferees, heirs, and assigns.

25.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

26.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

[SIGNATURE PAGES FOLLOW]

FOR PLAINTIFF THE UNITED STATES OF AMERICA:


JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division


Date: _26 Feb. 2016_

_Deborah A. Gitin_
_By AUSA L. Jay Gilbert_

DEBORAH A. GITIN
Senior Counsel
LESLIE COLEMAN
Trial Attorney
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice
301 Howard St., Suite 1050
San Francisco, CA 94105
Telephone:  (415) 744-6488
Facsimile:  (415) 744-6476

FOR PLAINTIFF THE UNITED STATES OF AMERICA:

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

Date: 26 Feb. 2016

*John A. Kolar*

JOHN A. KOLAR *by AUSA R. Jay Gilbert*
DONALD J. WILLIAMSON
Attorneys, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 307-9301
Facsimile:  (202) 514-7361

16

FOR PLAINTIFF THE UNITED STATES OF AMERICA (cont.):

JOHN E. KUHN, JR.
United States Attorney for the
Western District of Kentucky

Date: _26 Feb. 2016_

_L. Jay Gilbert_

WILLIAM F. CAMPBELL
L. JAY GILBERT
Assistant United States Attorneys
Western District of Kentucky
717 West Broadway
Louisville, KY 40202
Telephone:  (502) 582-6773
Facsimile:  (502) 625-7110

17

FOR PLAINTIFF THE UNITED STATES OF AMERICA (cont.):

Date: _Feb. 26, 2016_
(by AUSA LJGilbert)

MARY J. WILKES
Regional Counsel
Office of Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, SW
Atlanta, GA 30303

Date: _Feb. 26, 2016_
(by AUSA LJGilbert)

JOAN REDLEAF DURBIN
Senior Attorney
ROBERTO X. BUSO
Associate Regional Counsel
Office of Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, SW
Atlanta, GA 30303

FOR PLAINTIFF THE UNITED STATES OF AMERICA (cont.):

Date: 2/24/16

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Date: 2/26/16

LYNNE DAVIES
Attorney-Advisor
Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Telephone: (202) 564-2342

19

FOR PLAINTIFF-RELATOR NATURAL RESOURCES DEFENSE COUNCIL, INC.,
DR. THOMAS COCHRAN, CHARLES F. DEUSCHLE, RONALD B. FOWLER, AND
THE ESTATE OF GARLAND E. JENKINS:

Date: 2/26/2016 _____

GEOFFREY H. FETTUS, Senior Attorney
Natural Resources Defense Council, Inc.
115 15th Street NW, Suite 300
Washington, DC 20005

Date: 2/26/2016 _____

DR. THOMAS B. COCHRAN

Date: _____ _____

CHARLES F. DEUSCHLE

Date: _____ _____

RONALD B. FOWLER

Date: _____ _____

SUSIE JENKINS, as Administrator for the
Estate of Garland E. Jenkins

Date: _____ _____

JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: _____ _____

CHARLES J. FITZPATRICK
Egan, Fitzpatrick & Malsch, PLLC
12500 San Pedro Avenue, Suite 555
San Antonio, TX 78217
Telephone: (210) 496-5001
Facsimile: (210) 496-5011

Date: _____ _____

WILLIAM F. MCMURRY
William F. McMurry & Associates
624 W. Main Street, Suite 600
Louisville, KY 40202
Telephone: (502) 326-9000
Facsimile: (502) 326-9001

20

FOR PLAINTIFF-RELATOR NATURAL RESOURCES DEFENSE COUNCIL, INC.,
DR. THOMAS COCHRAN, CHARLES F. DEUSCHLE, RONALD B. FOWLER, AND
THE ESTATE OF GARLAND E. JENKINS:

Date: _____

GEOFFREY H. FETTUS, Senior Attorney
Natural Resources Defense Council, Inc.
115 15th Street NW, Suite 300
Washington, DC 20005

Date: _____

DR. THOMAS B. COCHRAN

Date: Feb. 26, 2016

*Charles F. Deuschle* signed with permission by Jennifer A. Williams
CHARLES F. DEUSCHLE

Date: Feb. 26, 2016

*Ronald B. Fowler* signed with permission by Jennifer A. Williams
RONALD B. FOWLER

Date: Feb. 26, 2016

*Susan Jenkins* signed with permission by Jennifer A. Williams
SUSIE JENKINS, as Administrator for the
Estate of Garland E. Jenkins

Date: Feb. 26, 2016

*James J. Sabella* signed with permission by Jennifer A. Williams
JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: _____

CHARLES J. FITZPATRICK
Egan, Fitzpatrick & Malsch, PLLC
12500 San Pedro Avenue, Suite 555
San Antonio, TX 78217
Telephone: (210) 496-5001
Facsimile: (210) 496-5011

Date: _____

WILLIAM F. MCMURRY
William F. McMurry & Associates
624 W. Main Street, Suite 600
Louisville, KY 40202
Telephone: (502) 326-9000
Facsimile: (502) 326-9001

FOR PLAINTIFF-RELATOR NATURAL RESOURCES DEFENSE COUNCIL, INC., DR. THOMAS COCHRAN, CHARLES F. DEUSCHLE, RONALD B. FOWLER, AND THE ESTATE OF GARLAND E. JENKINS:

Date: _____

_____
GEOFFREY H. FETTUS, Senior Attorney
Natural Resources Defense Council, Inc.
115 15th Street NW, Suite 300
Washington, DC 20005

Date: _____

_____
DR. THOMAS B. COCHRAN

Date: _____

_____
CHARLES F. DEUSCHLE

Date: _____

_____
RONALD B. FOWLER

Date: _____

_____
SUSIE JENKINS, as Administrator for the
Estate of Garland E. Jenkins

Date: _____

_____
JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: _Feb. 26, 2016_

_Charles J. Fitzpatrick_
_____
CHARLES J. FITZPATRICK
Egan, Fitzpatrick & Malsch, PLLC
12500 San Pedro Avenue, Suite 555
San Antonio, TX 78217
Telephone: (210) 496-5001
Facsimile: (210) 496-5011

Date: _____

_____
WILLIAM F. MCMURRY
William F. McMurry & Associates
624 W. Main Street, Suite 600
Louisville, KY 40202
Telephone: (502) 326-9000
Facsimile: (502) 326-9001

FOR PLAINTIFF-RELATOR NATURAL RESOURCES DEFENSE COUNCIL, INC., DR. THOMAS COCHRAN, CHARLES F. DEUSCHLE, RONALD B. FOWLER, AND THE ESTATE OF GARLAND E. JENKINS:

Date: _____

GEOFFREY H. FETTUS, Senior Attorney
Natural Resources Defense Council, Inc.
115 15th Street NW, Suite 300
Washington, DC 20005

Date: _____

DR. THOMAS B. COCHRAN

Date: _____

CHARLES F. DEUSCHLE

Date: _____

RONALD B. FOWLER

Date: _____

SUSIE JENKINS, as Administrator for the
Estate of Garland E. Jenkins

Date: _____

JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: _____

CHARLES J. FITZPATRICK
Egan, Fitzpatrick & Malsch, PLLC
12500 San Pedro Avenue, Suite 555
San Antonio, TX 78217
Telephone: (210) 496-5001
Facsimile: (210) 496-5011

Date: 2-26-16

WILLIAM F. MCMURRY
William F. McMurry & Associates
624 W. Main Street, Suite 600
Louisville, KY 40202
Telephone: (502) 326-9000
Facsimile: (502) 326-9001

20

FOR PLAINTIFF-RELATOR JOHN DAVID TILLSON:

Date: Feb. 26, 2016

_John David Tillson_ signed with permission by Jennifer A. Williams
JOHN DAVID TILLSON

Date: Feb. 26, 2016

_James J. Sabella_ signed with permission by Jennifer A. Williams
JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: _____

_____
STANLEY W. WHETZEL, JR.
Pence & Ogburn, PLLC
9300 Shelbyville Rd., Suite 1205
Louisville, KY 40222
Telephone: (502) 736-6200

FOR PLAINTIFF-RELATOR JOHN DAVID TILLSON:

Date: _____

_____
JOHN DAVID TILLSON

Date: _____

_____
JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Date: Febuary 26, 2016

_____
STANLEY W. WHETZEL, JR.
Pence & Ogburn, PLLC
9300 Shelbyville Rd., Suite 1205
Louisville, KY 40222
Telephone: (502) 736-6200

21

FOR DEFENDANTS

Date: 2/26/16

GLENN V. WHITAKER
VICTOR A. WALTON, JR.
ERIC W. RICHARDSON
MICHAEL J. BRONSON
PATRICK M. HAGAN
JOSEPH W. HARPER
VORYS, SATER, SEYMOUR
and PEASE, LLP
301 East Fourth St., Suite 3500
Great American Tower
Cincinnati, Ohio 45202
(513) 723-4000

RAYMOND B. LUDWISZEWSKI
MICHAEL K. MURPHY
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
(202) 955-8500

*Counsel for Lockheed Martin Corporation, Martin Marietta Corporation, Lockheed Martin Energy Systems, Inc., Martin Marietta Energy Systems, Inc., Lockheed Martin Utility Services, Inc. and Martin Marietta Utility Services, Inc.*

Authorized signatory for Lockheed Martin Defendants

Date: February 26, 2016

_____

Name:  Maryanne R. Lavan
Title:   Senior Vice President, General
         Counsel and Corporate Secretary
         Lockheed Martin Corporation

23

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

**FILED**

Jeffrey A. Apperson, Clerk

AUG 2 8 2003

U.S. DISTRICT COURT
WESTN. DIST. KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. NATURAL RESOURCES DEFENSE COUNCIL, et al., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 5:99CV00170-M |
| LOCKHEED MARTIN CORPORATION, et al., | ) ) ) |
| Defendants. | ) ) ) |

## UNITED STATES' AMENDED COMPLAINT

The United States of America ("United States" or "government"), for its complaint, states as follows:

### I. Jurisdiction and Venue

1.      This is an action by the United States against defendants Lockheed Martin Corporation and its predecessor, Martin Marietta Corporation; Lockheed Martin Energy Systems and its predecessor, Martin Marietta Energy Systems (referred to collectively as "Energy Systems"); and Lockheed Martin Utility Services and its predecessor, Martin Marietta Utility Services (referred to collectively as "Utility Services"), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act and subsequent amendments ("RCRA"), 42 U.S.C. § 6901 *et seq.,* and at common law.

2.      The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3732, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and equitable jurisdiction.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, 31 U.S.C. § 3732, and 42 U.S.C. § 6928(a).

## II. The Facility and the Parties

4.      This action involves the Paducah Gaseous Diffusion Plant ("PGDP") located near Paducah, Kentucky.  The PGDP is owned by the United States Department of Energy ("DOE"). The PGDP was operated during the relevant period by subsidiaries of defendants Martin Marietta Corporation and its successor, Lockheed Martin Corporation.  The PGDP is a "uranium enrichment" plant.

5.      The process of "uranium enrichment" is designed to increase the concentration by weight of the fissile isotope of uranium, i.e., U-235, and decrease the concentration of the non-fissile, heavier isotope found predominantly in natural uranium ore, i.e. U-238.  Through an increase in the concentration of U-235, uranium is made useful for purposes of producing energy either for nuclear weapons or for nuclear power.

6.      During the 1940's and early 1950's, the government developed "gaseous diffusion" as a technology for separating and/or concentrating U-235 from natural uranium ore and/or other uranium sources.  The process of gaseous diffusion involves a vast series of compressors and converters linked together in "cascades."  The electric-powered compressors inject uranium hexafluoride gas into the cascades, where it is then diffused through porous tubes, resulting in a higher concentration of U-235.  This process is repeated numerous times until the product is sufficiently enriched in U-235.

2

7.      Defendant Lockheed Martin Corporation ("Lockheed Martin") is a Maryland corporation with its principal office and place of business located at 6801 Rockledge Drive, Bethesda, Maryland.  Lockheed Corporation and defendant Martin Marietta Corporation ("Martin Marietta") merged in 1995 to form defendant Lockheed Martin Corporation.  At all times relevant to this Complaint, Lockheed Martin, or its predecessor corporation, Martin Marietta, owned defendants Martin Marietta Energy Systems, Lockheed Martin Energy Systems, Martin Marietta Utility Services, and Lockheed Martin Utility Services.

8.      Defendant Martin Marietta Energy Systems ("MMES"), a Delaware corporation, managed and operated the PGDP from April 1, 1984 through June 19, 1995, pursuant to several contracts with DOE (which are more fully described below).  MMES was a wholly-owned subsidiary of defendant Martin Marietta, which by agreement with DOE guaranteed MMES's performance of its contracts with DOE.

9.      From July 1, 1993 until June 19, 1995, a portion of defendant MMES's responsibilities for managing and operating the PGDP--i.e., the operation of the uranium enrichment facilities at the PGDP--was shifted to defendant Martin Marietta Utility Services ("MMUS"), another wholly-owned subisidiary of Martin Marietta, which is described more fully below.   However, MMES retained responsibilities under its contracts with DOE to perform various environmental restoration, site custodial, waste management, and other related services at the PGDP.

10.     Effective June 19, 1995, upon the merger of Lockheed Corporation and Martin Marietta, defendant Lockheed Martin Energy Systems ("LMES"), a Delaware corporation, assumed the contracts of defendant MMES with DOE. From June 19, 1995 until April 1, 1998, LMES succeeded to defendant MMES's responsibilities under those contracts to perform various

3

environmental restoration, site custodial, wastes management, and other related services at the PGDP. MMES and LMES are collectively referred to below as "Energy Systems."

11.  The enactment by Congress of the Energy Policy Act of 1992, called for the creation of a government-owned corporation, the United States Enrichment Corporation ("USEC"), to lease from DOE and operate the uranium enrichment facilities at the PGDP. USEC did in fact lease those facilities from DOE pursuant to a Lease Agreement effective July 1, 1993. DOE continued as owner of the entire PGDP site, continued to operate those buildings and grounds at the PGDP not leased to USEC, continued to be responsible for environmental restoration, site custodial, wastes management, and other related services and continued to be responsible for environmental compliance as to "legacy wastes," i.e., those generated prior to July 1, 1993, including legacy wastes stored inside buildings leased to USEC, with Energy Systems as its contractor for carrying out those responsibilities.

12.  Defendant Martin Marietta Utility Services ("MMUS"), a Delaware corporation, was created as a wholly-owned subsidiary of Martin Marietta to operate the uranium enrichment facilities that USEC had leased from DOE. MMUS operated those facilities pursuant to government contracts with USEC, which contracts are more fully described below. By agreement with USEC, Martin Marietta guaranteed the performance of MMUS under those contracts.

13.  Defendant Lockheed Martin Utility Services ("LMUS"), a Delaware corporation, is wholly owned by defendant Lockheed Martin Corporation. LMUS assumed the contracts of defendant MMUS with USEC upon the merger of Lockheed Corporation and Martin Marietta, effective June 19, 1995. LMUS continued to operate the PGDP under contract with USEC until

4

May 1, 1999, at which time the LMUS contract ended, and USEC began operating the facilities itself.

14.     During times relevant to this Complaint, the PGDP was subject to environmental regulation pursuant to RCRA and other environmental laws of the United States, which laws were administered by the United States Environmental Protection Agency ("EPA") and the Commonwealth of Kentucky ("State").

15.     The False Claims Act, 31 U.S.C. § 3730(b) provides that private persons may file an action pursuant to 31 U.S.C. §§ 3729 *et seq.* for the private person and the United States against a person violating the Act.  The private person initiating such an action is called a "relator."

16.     Relator Natural Resources Defense Council ("NRDC"), a not-for-profit corporation, is a national environmental public interest organization.  The NRDC maintains an office at 1200 New York Avenue, N.W., Suite 400, Washington, D.C. 20005.

17.     Relator Thomas B. Cochran, Ph.D., is the Director of the Nuclear Program and holds the Wade Green Chair for Nuclear Policy at the NRDC.  Dr. Cochran also has an office at 1200 New York Avenue, N.W., Suite 400, Washington, D.C. 20005.

18.     Relator Ronald B. Fowler has worked at the PGDP since 1991 and is currently a Production Support Training Manager at PGDP, where one of his jobs has been to identify and report safety concerns to senior management.  He resides in Paducah, Kentucky.

19.     Relator Charles F. Deuschle has worked at the PGDP from 1992 to 2003, during which time he resided in Paducah, Kentucky.

20.     Relator Garland ("Bud") E. Jenkins worked at the PGDP from 1968 until his retirement on May 31, 1999.  Prior to retiring, Mr. Jenkins worked as a chemical operator at the

chemical feed plant at the PGDP, and in other capacities at the site. He resides in Benton, Kentucky.

21.     Relators NRDC, Cochran, Fowler, Dueschle, and Jenkins filed the instant action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) on June 1, 1999. Pursuant to 31 U.S.C. § 3730(b)(2), on May 30, 2003, the government intervened in a part of their action and declined a part of their action.

22.     John David Tillson is a citizen and resident of the Commonwealth of Kentucky, who was employed at the PGDP from 1992 to 1996 by Science Applications International Company (SAIC), a subcontractor for Energy Systems. Mr. Tillson is the relator in the related *qui tam* case of *United States ex rel. Tillson v. Lockheed Martin Energy Systems, et al.*, Civil Action No. 5:00CV-39-R. On May 30, 2003, the government intervened in a part of Mr. Tillson's action and declined a part of his action.

### III. The DOE-Energy Systems Contracts

23.     As more particularly alleged in paragraphs 24-41 below, during all times relevant to this Complaint, in addition to being statutorily obligated to do so, Energy Systems was contractually obligated through its contracts with DOE to comply with RCRA in its treatment, storage and disposal of solid and hazardous wastes at the PGDP, having the specific responsibility for day-to-day RCRA activities at the site, including, but not limited to, waste analyses and handling, monitoring, record keeping, reporting, and contingency planning. Also, as specifically alleged below, Energy Systems was contractually bound to truthfully report any and all noncompliances with RCRA to DOE and to Federal and State environmental regulators.

24.     In 1984, MMES first entered into its contract with DOE to operate the PGDP. This contract, denominated Contract DE-AC05-84OR21400 ("Contract 21400"), also covered

MMES's operation for DOE of three other facilities: the Y-12 Nuclear Weapons Plant, the Oak Ridge National Laboratory, and the K-25 Gaseous Diffusion Plant. Contract 21400 was modified from time to time over the ensuing years. Under another contract, denominated Contract DE-AC05-76OR0001 ("Contract 0001"), MMES operated the Portsmouth Gaseous Diffusion Plant in Piketon, Ohio for DOE.

25. On September 29, 1989, the contractual instrument governing the operation of PGDP was changed from Contract 21400 to Contract 0001. This occurred through modification M039 to Contract 21400, which deleted the PGDP from the statement of work for that contract; and modification M084 to Contract 0001, which added the PGDP to the statement of work for that contract.

26. Effective April 1, 1991, the parties entered into modification M102 of Contract 0001, which contained the following terms, and required MMES to comply with environmental laws including RCRA in operating the PGDP for DOE. Clause C.1, the "STATEMENT OF WORK," provided in C.1(a) that MMES was to

> manage, operate and maintain . . . the plants and facilities described below [including the PGDP] and to perform the work and services described in this contract . . . upon the terms and conditions herein provided and in accordance with such directions and instructions not inconsistent with this contract which DOE may deem necessary or give [MMES] from time to time. In the absence of applicable directions and instructions from DOE, [MMES] will use its best judgment, skill, and care in all matters pertaining to the performance of this contract. [MMES] will not be required to operate the plants described below in any manner which it deems unsafe to the plants or personnel (including any third parties and members of the public).

27. In addition to uranium enrichment activities, the STATEMENT OF WORK, Clause C.1, provided in C.1(b) that MMES was to perform environmental and health activities

7

related to the enrichment of uranium; environmental protection and remediation services;

environmental restoration activities including the integrating contractor role regarding receiving

and disposal of environmental restoration-generated wastes; and research, development, design

and demonstration activities to satisfy environmental protection, safety and health requirements.

28.   Clause I.60, "ENVIRONMENT, SAFETY, AND HEALTH," of modification

M102 of Contract 0001 provided in pertinent part that MMES was to "take all reasonable

precautions in the performance of the work under this contract to protect the environment and

the safety and health of employees and of members of the public and shall comply . . . with all

applicable environmental, safety and health regulations and requirements (including reporting

requirements) of DOE."  In 1991, RCRA was among the environmental requirements applicable

to the plant.

29.   Clause I.76, "PERMITS OR LICENSES," of modification M102 of Contract

0001, provided:

> (a)   Except as otherwise directed by the Contracting Officer, [MMES] shall procure all necessary permits or licenses and abide by all applicable laws, regulations, and ordinances of the United States and of the state . . . and political subdivision in which the work under this contract is performed.

> (b)   With respect to permits under the Resource Conservation and Recovery Act (RCRA) and related state statutes, the parties entered into an agreement on October 2, 1990, for facilities in Piketon, Ohio and Paducah, Kentucky, which is attached to this contract as Appendix D, which describes the roles and responsibilities of DOE and Energy Systems in obtaining and complying with RCRA permits for those facilities.  The terms of Appendix D, as they may be modified from time to time, shall control the responsibilities of [MMES] imposed by subparagraph (a) above, as they relate to compliance with RCRA.

30.     Appendix D, in turn, provided that Energy Systems would sign the PGDP's RCRA permit as a "co-operator" with RCRA responsibilities for day-to-day operations including waste analyses and handling, monitoring, record keeping, reporting, and contingency planning; that DOE would sign the permit as owner and operator with responsibilities for policy, programmatic, funding, scheduling decisions, and general oversight; and that for purposes of the certification required by 40 C.F.R. Section 270.11(d), DOE's and Energy Systems' representatives would certify, to the best of their knowledge and belief, the truth, accuracy and completeness of the application for their respective areas of responsibility.  Appendix D also provided that Energy Systems had primary responsibility for the preparation and submission of RCRA permit applications and permits, for spill reports, for reports of non-compliances that might endanger health and the environment, for reports of unmanifested wastes, for annual solid waste management units listings, and for land disposal restrictions. The agreement also expressly provided that "Energy Systems is expected to notify the regulators and DOE of newly discovered noncompliances."

31.     Clause I.64, ALLOWABLE COST AND FEE, of modification M102 of Contract 0001 provided in pertinent part that Energy Systems would be paid an award fee for performance of the work under the contract, and that the government would reimburse Energy Systems for many of the costs it incurred in performing such work, but that any losses and expenses resulting from willful misconduct or lack of good faith by Energy Systems's directors, corporate officers, or supervising representatives would be unallowable costs under the contract.

32.     Effective July 1, 1993, through modification M107 of Contract 21400, MMES's responsibilities for operating the PGDP were transferred back under Contract 21400 (from Contract 0001) with changes to the scope of work reflecting the fact that uranium enrichment

9

operations were thence to be the responsibility of MMUS acting under contracts with USEC, and no longer the responsibility of MMES. MMES retained responsibility, however, for RCRA compliance with regard to "legacy wastes," and wastes newly generated in the course of environmental restoration and waste management activities at the site, pursuant to contractual provisions imposing RCRA obligations on MMES that were the same in all material respects as those imposed under modification M102 of Contract 0001, including Appendix D thereto, as summarized in paragraphs 26-31, above.

33.     Effective October 1, 1995, DOE and LMES entered into modification M152 of Contract 21400. Clause C.1, "STATEMENT OF WORK," of this modification obligated LMES to manage, among other things, DOE's Environmental Management and Enrichment Facilities Programs. Clause C.1(d) provided in pertinent part: "The primary mission of the Environmental Management and Enrichment Facilities Programs is to provide environmental restoration and waste management services, technology development, and operations management for the DOE . . . facilities not leased to the United States Enrichment Corporation in Paducah, Kentucky . . . ." This clause specified as programmatic activities to be performed by LMES the following: "[e]nvironmental restoration activities including characterizations, investigations, and remediations supporting . . . RCRA actions"; "treating, storing, and disposing of environmental restoration generated wastes"; "environmental protection [and] remediation activities"; and "[w]aste management activities, including . . . operation of waste treatment, storage, and disposal facilities."

34.     Clause 1.105, ENVIRONMENTAL PROTECTION," of modification M152 of Contract 21400 provided in pertinent part:

(a)     In addition to complying with the requirements set forth in the "CLEAN AIR AND WATER" clause, in the performance of this contract [LMES] shall comply, as applicable, with the following . . . :

(4) The Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. 9601 et seq.) . . . .

35.     Clause I.75, "ENVIRONMENT, SAFETY AND HEALTH," of modification M152 of Contract 21400 provided in pertinent part:

(a)     [LMES] shall perform the work under this contract in a manner that is safe and healthy, and environmentally acceptable and shall develop and manage a comprehensive program in support of these objectives.

(b)     In addition to the requirements in the contract clause, "ENVIRONMENTAL PROTECTION," [LMES] shall comply with applicable Federal and non-Federal safety and health laws, codes, ordinances, and regulations . . . [LMES] shall cooperate appropriately with Federal and non-Federal agencies having jurisdiction over environmental and safety and health matters under this contract.

36.     Clause I.92, "PERMITS OR LICENSES," of modification M152 of Contract 21400 provided:

Except as otherwise directed by the Contracting Officer, [LMES] shall procure all necessary permits or licenses and abide by all applicable laws, regulations, and ordinances of the United States and of the state . . . and political subdivision in which the work under this contract is performed.

37.     Appendix D to modification M152 of Contract 21400, dated August 30, 1995, in terms materially the same as those incorporated into earlier modifications of the Contract, provided that Energy Systems would sign the PGDP's RCRA permit as a "co-operator" with RCRA responsibilities for day-to-day operations including waste analyses and handling, monitoring, record keeping, reporting, and contingency planning; that DOE would sign the

11

permit as owner and operator with responsibilities for policy, programmatic, funding, scheduling decisions, and general oversight; and that for purposes of the certification required by 40 C.F.R. Section 270.11(d), DOE's and Energy Systems' representatives would certify, to the best of their knowledge and belief, the truth, accuracy and completeness of the application for their respective areas of responsibility.  Appendix D also provided that Energy Systems had primary responsibility for the preparation and submission of RCRA permit applications and permits, for spill reports, for reports of non-compliances that might endanger health and the environment, for reports of unmanifested wastes, for annual solid waste management units listings, and for land disposal restrictions. The agreement also expressly provided that "Energy Systems is expected to notify the regulators and DOE of newly discovered noncompliances."

38.     Clause B.2, "BASIC FEE AND AWARD FEE," of modification 152 of Contract 21400 provided that Energy Systems would be paid a base fee and an award fee for performance of the work under the contract.

39.     In addition, Clause B.3, "PERFORMANCE-BASED INCENTIVE FEE," of modification 152 of Contract 21400 provided that Energy Systems could receive performance incentive fees as an inducement to maximize its performance in the environmental restoration and waste management areas, among others.  However, subparagraph (d) of this clause provided that Energy Systems could forfeit the performance incentive fee for the willful or knowing violation of any regulatory reporting requirements by any of its managerial personnel.

40.     Clause I.78, "ALLOWABLE COSTS AND FEE," modification M152 of Contract 21400 provided that the government would reimburse Energy Systems for many of the costs it incurred in performing the  work under the contract, but that any losses and expenses resulting

12

from willful misconduct or lack of good faith by Energy Systems's managerial personnel would be unallowable costs under the contract.

41.     Although Contract 21400 was modified from time to time subsequent to the execution of modification M152, none of those modifications changed in material respects LMES's environmental compliance obligations including its obligations to comply with RCRA and to report environmental noncompliances to DOE and to regulators.

### IV.  The USEC-Utility Services Contracts

42.     Contract USECHQ-93-C-001 ("Contract 93-C-001") between USEC and Utility Services governed Utility Services' managment of USEC's uranium enrichment operations at the PGDP, effective July 1, 1993.  Clause A.11, "ENVIRONMENTAL REGULATIONS," provided that "[Utility Services] will take all reasonable precautions in the performance of the work under this Contract so as to protect the environment and shall comply with all applicable environment [sic] regulations and requirements (including reporting requirements) of applicable regulatory agencies."

43.     Clause I.76(a), "PERMITS OR LICENSES," of Contract 93-C-001 provided in pertinent part "Except as otherwise directed by the Contracting Officer, [Utility Services] shall procure all necessary permits or licenses and abide by all applicable laws, regulations, and ordinances of the United States and of the state . . . in which the work under this contract is performed."

44.     Clause I.64, "ALLOWABLE COST AND FEE," of Contract 93-C-001, provided that Utility Services would be paid a fee for performance of the work under the contract, and that the government would reimburse Utility Services for many of the costs it incurred in performing such work, but that any losses and expenses resulting from willful misconduct or lack of good

faith by Energy Systems's directors, corporate officers, or supervising representatives would be unallowable costs under the contract.

45.     Modification 006 of Contract 93-C-001, effective October 1, 1993, provided that Utility Services was eligible to be paid a $3,000,000 incentive fee, so long as it met all of a series of conditions precedent, including that it make no knowing or willful falsification of a required certification in the environmental area.

46.     Contract 93-C-001 was replaced by Contract USEC-96-C-001 ("Contract 96-C-001"), effective October 1, 1995.  In Article XVI, Section 16.5 of this contract, Utility Services agreed that its "performance of the Services and of its other obligations under this Contract shall be in compliance with Applicable Law."  "Applicable Law" was defined as including any national and state permit, law, statute, rule, regulation, ordinance, order, judgment, decree, directive or decision relating to environmental protection.

47.     Article VI, Section 6.4 of Contract 96-C-001 provided that Utility Services could earn incentive fees, and Schedule J to the contract provided that a condition precedent to its earning incentive fees was that Utility Services make no knowing or willful falsification of a required certification in the environmental area.

48.     Article VI, Section 6.2, together with Schedule F, of Contract 96-C-001 provided that the government would reimburse Utility Services for many of the costs it incurred in performing the work under the contract, but that any losses and expenses resulting from willful misconduct or lack of good faith by Utility Services's directors, corporate officers, or key persons would be unallowable costs under the contract.

49.     Thus, beginning in 1993, Utility Services was contractually obligated to comply with RCRA in its treatment, storage and disposal of solid and hazardous wastes at the PGDP,

14

and to make truthful reports regarding environmental conditions at the PGDP to USEC and to Federal and State environmental regulators.

## RCRA VIOLATIONS - 42 U.S.C. § 6928(a)

### Count I - Failure to Make Hazardous Waste Determinations

50.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 49, inclusive.

51.     On January 1, 1985, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), and 40 C.F.R. Part 271, Subpart A, EPA granted the State final authorization to administer its own hazardous waste management program in lieu of the federal hazardous waste management program established under Subchapter III of RCRA, 42 U.S.C. §§ 6921-6939b.

52.     On June 25, 1996, EPA granted the State final authorization to administer the hazardous waste management requirements and prohibitions imposed pursuant to the 1984 Hazardous and Solid Waste Amendments ("HSWA") to RCRA in lieu of the federal hazardous waste management program established under Subchapter III of RCRA, 42 U.S.C. §§ 6921-6939b.

53.     The provisions of the authorized Kentucky hazardous waste management program are federally enforceable by EPA upon notice to the state, pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

54.     Notice of the commencement of this action has been given to the State pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

55. The defendants are "persons" as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(203); 32:005, Section 1(203); 34:005, Section 1(203); 37:005, Section 1(203); 38:005, Section 1(203).

56. The PGDP is a "facility" as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(93); 32:005, Section 1(93); 34:005, Section 1(93); 37:005, Section 1(93); 38:005, Section 1(93).

57. The defendants were "operators" of the PGDP, as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(192); 32:005, Section 1(192); 34:005, Section 1(192); 37:005, Section 1(192); 38:005, Section 1(192), from approximately 1984 to 1998.

58. From approximately 1984 to 1998, the defendants generated large quantities of solid waste during their tenure as operator of the PGDP, including but not limited to hydrofluoric acid, media contaminated with trichloroethylene ("TCE") generated from remediation activities at the facility, spent batteries, waste oil, tanks, drums, discarded rags, discarded motor parts, and miscellaneous equipment containing liquids.

59. From approximately 1984 to 1998, the defendants generated solid waste, as defined in 42 U.S.C. § 6903(27), 40 C.F.R. § 261.2, and 401 KAR 30:005, Section 1(26), at the PGDP, including but not limited to the solid wastes identified in paragraph 58.

60. On numerous occasions between 1984 and 1998, the defendants failed to properly determine, in accordance with the provisions of 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2, if the solid waste it generated at the PGDP was hazardous waste, as defined in 42 U.S.C. § 6903(5), 40 C.F.R. § 261.3, and 401 KAR 30:005, Section 1(13); 31:005, Section 1(118); 32:005, Section 1(118); 34:005, Section 1(118); 37:005, Section 1(118); 38:005, Section 1(118), as required by 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2.

16

61.     Each failure by the defendants to make a hazardous waste determination pursuant to 40 C.F.R. § 262.11 and 401 KAR 32:010, Section 2, for the solid waste they generated at the PGDP constitutes a separate violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2.

62.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2, occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 40 C.F.R. § 262.11 and/or 401 KAR 32:010, Section 2, occurring on or after January 31, 1997.

### Count 2 - Failure to Comply with Land Disposal Restrictions
### For Hazardous Waste

63.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 62, inclusive.

64.     From approximately 1984 to 1998, the defendants took actions and implemented processes during their tenure as operator of the PGDP that produced hazardous waste, as defined in 42 U.S.C. § 6903(5), 40 C.F.R. § 261.3, and 401 KAR 30:005, Section 1(13); 31:005, Section 1(118); 32:005, Section 1(118); 34:005, Section 1(118); 37:005, Section 1(118); 38:005, Section 1(118), or caused a hazardous waste to become subject to regulation, including but not limited to trichloroethylene ("TCE"); hydrofluoric acid; aqua regia (nitric/hydrochloric acid mixture); sodium hydroxide; contaminated media generated from remediation activities at the facility

17

containing TCE/F001 listed waste; circuit boards, diodes, fuses, and capacitors containing hazardous constituents; electrical components containing mercury; kerosene; and spent batteries.

65.     Between approximately 1984 and 1998, the defendants stored hazardous waste, within the meaning of 40 C.F.R. §§ 260.10, 261.3 and 401 KAR 30:005, Section 1(13); 31:005, Section 1(118), (266); 32:005, Section 1(118), (266); 34:005, Section 1(118), (266); 37:005, Section 1(118), (266); 38:005, Section 1(118), (266), at the PGDP, including but not limited to the wastes identified in paragraph 64.

66.     Each of the defendants is a "generator," as defined in 40 C.F.R. § 260.10 and 401 KAR 31:005, Section 1(111); 32:005, Section 1(111); 34:005, Section 1(111); 37:005, Section 1(111); 38:005, Section 1(111), of hazardous waste, including but not limited to the hazardous wastes identified in paragraph 64.

67.     On numerous occasions between 1984 and 1998, the defendants failed to properly determine, in accordance with the provisions of 40 C.F.R. § 268.7(a)(1) and 401 KAR 37:010, Section 7(1), if the hazardous waste it generated at the PGDP required treatment in order to meet the applicable standards set forth in 40 C.F.R. Part 268, Subpart D, and 401 KAR Chapter 37, for land disposal, as defined in 42 U.S.C. 6924(k), 40 C.F.R. § 268.2(c) and 401 KAR 37:005, Section 1(155), as required by 40 C.F.R. § 268.7(a)(1) and 401 KAR 37:010, Section 7(1).

68.     On numerous occasions between 1984 and 1998, the defendants shipped hazardous waste to off-site treatment, storage and disposal ("TSD") facilities without sending a notice indicating whether material being shipped contained hazardous waste and whether the material being shipped met the applicable treatment standards set forth in 40 C.F.R. Part 268, Subpart D, and 401 KAR Chapter 37, for land disposal, as defined in 42 U.S.C. 6924(k), 40

18

C.F.R. § 268.2(c) and 401 KAR 37:005, Section 1(155), as required pursuant to 40 C.F.R. § 268.7(a)(2) and (3) and 401 KAR 37:010, Section 7(1)(a) and (b).

69.     On numerous occasions between 1984 and 1998, the defendants failed to retain on-site a copy of all notices, certifications, demonstrations, waste analysis data, and other documentation produced pursuant to 40 C.F.R. § 268.7 and 401 KAR 37:010, Section 7, for specified time period from the date that the waste that was the subject of such documentation was last sent for off-site or on-site treatment, storage or disposal, as required pursuant to 40 C.F.R. § 268.7(a)(8) and 401 KAR 37:010, Section 7(g).

70.     Each failure of the defendants to comply with the land disposal restriction requirements set forth in 40 C.F.R. § 268.7 and 401 KAR 37:010, Section 7, as set forth in paragraphs 67, 68, or 69 of this Complaint, constitutes a separate violation of 40 C.F.R. § 268.7 and/or 401 KAR 37:010, Section 7.

71.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 40 C.F.R. § 268.7 and/or 401 KAR 37:010, Section 7 occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 40 C.F.R. § 268.7 and/or 401 KAR 37:010, Section 7 occurring on or after January 31, 1997.

## Count 3 - Failure to Comply with Hazardous Waste Shipment Requirements

72.     Paragraphs 1 through 71 are realleged and incorporated herein by reference as though fully set forth herein.

73.     On numerous occasions between 1984 and 1998, the defendants transported or offered for transport hazardous waste to off-site TSD facilities without preparing a proper manifest, or without otherwise complying with all manifest requirements, as prescribed in 40 C.F.R. Part 262, Subpart B, and 401 KAR 32:020.

74.     On numerous occasions between 1984 and 1998, the defendants transported or offered for transport hazardous waste to off-site TSD facilities without properly packaging, labeling, or otherwise preparing the shipment in accordance with all pre-transport requirements as prescribed in 40 C.F.R. Part 262, Subpart C, and 401 KAR 32:030.

75.     On numerous occasions between 1984 and 1998, the defendants failed to prepare and submit biennial or annual reports and exception reports to the appropriate federal and state regulators, and failed to maintain copies of such reports as well as manifests and other records required to be maintained under 40 C.F.R. Part 262 and 401 KAR Chapter 32, as prescribed in 40 C.F.R. Part 262, Subpart C, and 401 KAR 32:040.

76.     Each failure of the defendants to prepare a proper manifest or to otherwise comply with all manifest, pre-transport, and notice and recordkeeping requirements prescribed in 40 C.F.R. Part 262, Subparts B, C, and D, and 401 KAR 32:020, 32:030, and 32:040, as set forth in paragraphs 73, 74 and 75, constitutes a separate violation of 40 C.F.R. Part 262 and/or 401 KAR Chapter 32.

77.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended*

20

*by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and

61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to

$25,000 per day for each violation of 40 C.F.R. Part 262, Subpart B, and/or 401 KAR Chapter 32

occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each

violation of 40 C.F.R. Part 262, Subpart B, and/or 401 KAR Chapter 32 occurring on or after

January 31, 1997.

### Count 4 - Operating a Hazardous Waste Disposal Facility Without a Permit or Interim Status

78.     Paragraphs 1 through 77 are realleged and incorporated herein by reference as though fully set forth herein.

79.     On numerous occasions between 1984 and 1998, the defendants disposed of hazardous waste, within the meaning of 40 C.F.R. §§ 260.10, 261.3 and 401 KAR 30:005, Section 1(13); 31:005, Section 1(66); 32:005, Section 1(66); 34:005, Section 1(66); 37:005, Section 1(66), (118); 38:005, Section 1(66), (118), at the PGDP, including but not limited to the wastes identified in paragraph 64.

80.     For most or all of the period between 1984 and 1998, the defendants operated a facility that was used for the disposal of hazardous waste without obtaining a permit, as required by 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and 401 KAR 38:010, and did not qualify for interim status pursuant to 42 U.S.C. § 6925(e), 40 C.F.R. Part 270, Subpart G, and 401 KAR 38:020, and was not otherwise exempt from such permit requirements under any provision of law.

81.     Each day that the defendants operated the PGDP without a permit authorizing the disposal of hazardous waste at the facility constitutes a separate violation of 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and 401 KAR 38:010.

21

82.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and/or 401 KAR 38:010 occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 42 U.S.C. § 6925(a), 40 C.F.R. Part 270, and/or 401 KAR 38:010 occurring on or after January 31, 1997.

### Count 5 - Failure to Comply with RCRA Permit Conditions

83.     Paragraphs 1 through 82 are realleged and incorporated herein by reference as though fully set forth herein.

84.     On or about May 18, 1990, Energy Systems submitted to the State an application for a RCRA Part B hazardous waste treatment and storage permit for the PGDP, pursuant to 40 C.F.R. Part 270, Subpart B, and 401 KAR Chapter 38.

85.     A RCRA permit for the PGDP ("the Permit") was approved by the State effective on or about August 19, 1991, authorizing the treatment and storage of hazardous waste at the PGDP under certain terms and conditions set forth in the Permit. There have been fifteen modifications to the Permit since August 19, 1991.

86.     Between 1991 and 1998, the defendants stored hazardous waste in locations or otherwise in a manner not authorized under Permit condition II.H.

87.     Between 1991 and 1998, the defendants stored hazardous waste in locations or otherwise in a manner not authorized under Permit condition II.I.

22

88.     On numerous occasions between 1991 and 1998, the defendants stored hazardous waste without first obtaining or performing a general waste analysis and otherwise complying with all requirements set forth under 401 KAR 34:020, Section 4, as required under Permit condition II.B.2.

89.     Between 1991 and 1998, the defendants did not maintain and operate the PGDP in a manner that minimized the possibility of a fire, explosion, or unplanned sudden or non-sudden release of hazardous waste or hazardous constituents to air, soil or surface water which could threaten human health and/or the environment, as required under Permit condition II.C.1.

90.     Between 1991 and 1998, the defendants failed to comply with the recordkeeping and reporting requirements set forth in Permit condition II.F, including but not limited to their failure to maintain records describing the nature and quantity of all hazardous waste at the PGDP and the method and location of storage.

91.     Between 1991 and 1998, the defendants failed to report numerous instances of non-compliance with Permit requirements that might endanger human health or the environment within 2 hours from the time the defendants became aware of the non-compliance, as required under Permit condition III.E.14 (original Permit condition III.E.15).

92.     Between 1991 and 1998, the defendants failed on numerous occasions to report instances of non-compliance with Permit requirements that were not reported under Permit condition III.E.14 (original Permit condition III.E.15) at the time annual reports were submitted to Federal and State regulators, as required under Permit condition III.E.15 (original Permit condition III.E.16).

93.     Between 1991 and 1998, the defendants failed on numerous occasions to report newly identified Solid Waste Management Units, as defined in Permit Part III.D, discovered

23

during the course of groundwater monitoring, field investigations, environmental audits, or other means, to Federal and/or State regulators, as required under Permit condition IV.B.1.

94.     Each failure of the defendants to comply with a Permit condition at the PGDP constitutes a separate violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1).

95.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g); the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (1990), *amended by* Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321-373 (1996) (28 U.S.C. § 2461 note); and 61 Fed. Reg. 69,360 (Dec. 31, 1996), each of the defendants is liable for a civil penalty of up to $25,000 per day for each violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1) occurring prior to January 31, 1997, and a civil penalty of up to $27,500 per day for each violation of 40 C.F.R. § 270.30(a) and/or 401 KAR 38:030, Section 1(1) occurring on or after January 31, 1997.

**FALSE CLAIMS ACT VIOLATION - 31 U.S.C. § 3729(a)(1) and (a)(2)**

**Count 6 - (False Claims Act)**

96.     This is a claim by plaintiff United States against defendants for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2). Beginning in 1993 and continuing to 1999, defendants knowingly presented or caused to be presented to officers or employees of the government false and fraudulent claims for payment and approval, and knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the government.

97.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 95, inclusive.

24

98.     Beginning in 1987 or earlier, DOE had recognized the applicability of RCRA to hazardous and mixed wastes (wastes consisting of a combination of hazardous and radioactive constituents) at DOE's facilities, and required its management and operations contractors to bring its various facilities into compliance with RCRA, and to inform DOE and regulators of non-compliances with RCRA.

99.     On or about February 16, 1990, Energy Systems represented to DOE's Oak Ridge Operations Office ("ORO") that Energy Systems had in place an extensive program of advising the Department of Energy of all instances of actual or potential non-compliance with environmental laws and regulations. Energy Systems further represented that this was done, not only through oral communications, but also through immediate follow-up written correspondence. Energy Systems further told DOE that Energy Systems would ensure that the regulators were also notified of such actual or potential non-compliances.

100.    As a purported example of this program of notifying DOE in writing of non-compliances, on or about February 28, 1990, Energy Systems advised ORO that 60 drums of potentially hazardous waste remained uncharacterized, but that with the exception of those drums, all other wastes had been appropriately characterized and stored. Energy Systems acknowledged that improper storage would be a nonconformance with RCRA.

101.    On or about January 28, 1991, DOE's Contracting Officer for the Paducah contract, at the direction of the Undersecretary of Energy, informed Energy Systems that DOE considered the identification and remediation of environmental compliance problems as matters of the highest priority which Energy Systems was contractually bound to address. The Contracting Officer further advised Energy Systems that it was DOE's policy that issues of

potential environmental noncompliance should be promptly disclosed and addressed in a compliance agreement with the appropriate regulatory authority.

102.     On or about September 8, 1993, DOE's Manager of the Oak Ridge Operations Office, who was also the Contracting Officer, reiterated to Energy Systems that it was insufficient simply for Energy Systems to notify DOE in writing of environmental non-compliances, but that all such notifications were required to include a corrective action plan appropriate to the circumstances.

103.     On or about April 25, 1994, Energy Systems manager for Environmental Restoration and Waste Management at the PGDP, Jimmy Massey, represented to DOE's Manager of the PGDP facility that "[Energy Systems] views identification and remediation of environmental problems, as well as timely notification, as matters of highest priority to which we are contractually bound . . . . "

104.     Thus, Energy Systems was informed by DOE that it was DOE's policy, established at the highest level of the agency, as well as the express directive of the Contracting Officer, that Energy Systems comply with the environmental laws, including RCRA, that Energy Systems truthfully and fully report all actual and potential RCRA non-compliances to both DOE, and Federal and State regulators, and that notifications of non-compliances were required to be in writing and include a corrective action plan.  Energy Systems also knew that, if any subordinate of the Contracting Officer might purport to waive, excuse, ignore or not enforce these requirements, such subordinate would be acting outside the scope of his or her authority and contrary to the policy of DOE, the express directive of the Contracting Officer, and the terms of the contract.

105.   Following USEC's leasing of certain buildings at the PGDP effective July 1, 1993, DOE, USEC and the defendants agreed that DOE would continue to operate through Energy Systems RCRA storage units at the PGDP, including storage units in USEC-leased buildings.  They further agreed that labor at those units would be provided by Utility Services under the supervision of Energy Services.

106.   At some time between 1984, when it began to operate the PGDP for DOE, and 1998, the exact date being presently unknown to plaintiff, Martin Marietta (and/or its successor, Lockheed Martin) formed an intention to purchase and acquire the uranium enrichment operations at the PGDP from the government.

107.   As of mid-1993, Energy Systems and Utility Services were aware that the USEC uranium enrichment operations at the PGDP might be privatized through a sale to investors or to an existing private corporation within two years.

108.   In or about late 1997 or the first half of 1998, the exact date bring presently unknown to plaintiff, Lockheed Martin began developing its proposal to purchase and acquire the USEC uranium enrichment operations at the PGDP from the government.

109.   In or about May 1998, Lockheed Martin submitted an ultimately unsuccessful proposal to purchase and acquire the USEC uranium enrichment operations at the PGDP from the government.  Certain of the actions by defendants described below resulted in a shifting of environmental liability to DOE from the uranium operations which Lockheed Martin sought to acquire.

110.   (a)      As more particularly described in paragraphs 116-158, below, beginning in the early 1990's, defendants Energy Systems and Utility Services submitted and caused to be submitted false and fraudulent statements, and concealed material information from the

27

government, regarding the nature, degree, and circumstances of RCRA non-compliances at the PGDP. The defendants' false and fraudulent statements, and material concealments were made knowingly, within the meaning of 31 U.S.C. § 3729(b), to get false claims for costs, award fees, and incentive fees, paid and approved by the government, resulting in monetary damages to the government.

(b)     The defendants' false and fraudulent statements and material concealments fostered a false impression on the part of the government that defendants were doing a good job of implementing RCRA at the PGDP, and that any non-compliances that were discovered at the PGDP were sporadic, minor, and promptly corrected. In reality, defendants knew of substantial non-compliances with RCRA that they failed to report to the government. Those non-compliances included the illegal storage of hazardous wastes in approximately 150 areas known as "Material Storage Areas" or "MSA's," as well as the defendants' failure to make hazardous waste determinations, their failure to comply with land disposal restrictions for hazardous waste, their failure to comply with hazardous waste shipment requirements, their operation of a hazardous waste disposal facility without a permit or interim status, and their failure to comply with RCRA permit conditions, as alleged in paragraphs 50-95, above. Furthermore, defendants knowingly concealed the fact that large quantities of wastes contaminated with trichloroethylene (TCE) from degreasing activities at the PGDP constituted "listed" hazardous wastes. Defendants illegally stored these TCE-contaminated listed wastes in non-RCRA-permitted storage areas including the MSA's, and illegally disposed of these listed wastes in landfills at the PGDP that were not permitted for the disposal of hazardous wastes, including C-404, C-746-S, C-746-T, and C-746-U. Also, by allowing listed wastes to be mixed with environmental media such as soil and water, defendants significantly increased the volume of substances required to be

28

managed pursuant to RCRA, and these hazardous wastes were also illegally stored in non-RCRA-permitted storage areas, and illegally disposed of in the aforementioned landfills at the PGDP.

(c)     The defendants' false and fraudulent statements, and material concealments impeded, obstructed, and interfered with, the regulatory activities of EPA and the State in properly administering RCRA at the PGDP, for example, by concealing from those agencies conditions and circumstances that might have led them to issue notices of violation (NOV's) for violations of RCRA, and/or which might have resulted in the more timely effectuation of corrective action plans for oustanding non-compliances, had they known the truth.  By falsely representing the nature, degree and circumstances of RCRA non-compliances at the PGDP to EPA and the State, defendants influenced the amounts the government paid under contracts with defendants since the government's assessment of their cooperation with the regulatory agencies was a material consideration in the government's determination of the amounts of costs, award fees, and incentive fees to be paid defendants.

(d)     Had the government known the truth regarding defendants' substantial non-compliances with RCRA, and their false reporting and misrepresentations regarding RCRA non-compliances at the PGDP, the government would have paid defendants less in costs, award fees, and incentive fees than the government actually paid.

### Description of the Material Storage Areas (MSA's)

111.    The MSA's were areas inside buildings and outdoors at the PGDP where materials (still useful items such as spare parts, not regulated under RCRA) were intermixed with solid wastes, some of which were hazardous and/or radioactive.  Some MSA's were small, containing perhaps a couple of drums.  Others were large and contained varying combinations of drums,

29

scrap metal, old parts for the enrichment process, electrical equipment, furniture, trucks, chemical tanks, light bulbs, rags, used motor parts, used batteries, used oil, tanks, miscellaneous equipment containing liquids, hydrofluoric acid, and contaminated media generated from remediation activities at the facility.

112.    In December 2000, reports were submitted to the State identifying 147 MSA's as "Solid Waste Management Units" ("SWMU's") within the meaning of RCRA. A summary of those reports is attached to this Complaint as Appendix A, and is hereby incorporated by reference. These SWMU reports identified solid wastes being stored in 138 MSA's.

113.    The defendants stored hazardous wastes without a RCRA permit in the following MSA's: C-310-02, C-331-05, C-331-06, C331-10, C-331-14, C-331-15, C-331-16, C-333-20, C-333-21, C-333-31, C-335-5, C-400-04, C-400-05, C-409-01, C-409-02, OS-3, OS-5, OS-8, OS-9, OS-11, and OS-12. Additional hazardous wastes were stored without a RCRA permit in other MSA's, and elsewhere on the PGDP site, including, for example, the H3 Pad. The hazardous wastes stored illegally included thousands of containers of listed hazardous wastes in regard to which defendants had knowingly failed to make listing determinations, as alleged in paragraph 155, below.

114.    MSA C-400-04 contained RCRA hazardous wastes posing a potential threat of bodily injury and property damage in an area that was not permitted to store hazardous wastes. This MSA contained a deteriorating drum of hydrofluoric acid (HF), a container of "aqua regia" (a combination of two strong acids), a container of nitric acid with neptunium in solution, a cardboard box of sodium hydroxide, and laundry bleach spread out on the floor in powder form.

115.    Beginning in 1992, defendants knew of the presence in the MSA's of RCRA-regulated solid wastes, some of which were hazardous, based upon their activities in 1992-93

30

and thereafter in filling out Requests for Disposal ("RFD's") for many of the items in the MSA's,

their frequent utilization of the buildings and outside areas where the MSA's were located, their

numerous walk-downs and inspections of the MSA's themselves, and their Rad Area Reduction

Project ("RARP") which is described more fully in paragraphs 116-120, below.

### Defendants' False and Fraudulent Conduct With Respect To The Radiation Area Reduction Project (RARP)

116.    Defendants conducted the RARP from late 1994 through approximately October

1996.  This project was an effort to consolidate and relocate the contents of the MSA's in such a

way as to reduce the total floor space taken up by the MSA's in various buildings at the PGDP

including the four large process buildings, C-331, C-333, C-335, and C-337.  Defendants' work

with the contents of the MSA's for a period of two years gave defendants a close and detailed

familiarity with the wastes, including the hazardous wastes, located therein.

117.    Defendants gained government approval of the RARP, *inter alia*, based on the

government's understanding, induced by defendants' representations, that ongoing

characterization of the items in the MSA's would be an important part of the project scope.

When Utility Services employees commenced the project, under the supervision of Energy

Systems, they inventoried each item and characterized it for radiation prior to packing it into

large containers called "B-25 boxes" or moving it to a new location.  This was a necessary safety

measure to avoid creating new nuclear criticality safety concerns with respect to the more

compact MSA's into which Utility Services was relocating the items.

118.    One implication, if Utility Services were to create new nuclear criticality safety

concerns in the new, more compact MSA's, would be that it would be more expensive for DOE

in the future to process and dispose of items in the MSA's inasmuch as those items could not be

31

processed and stored without taking more complicated and expensive nuclear criticality safety

precautions.  In fact, in late 1994, defendants knew that the failure to radioactively characterize

items before consolidating and moving them would impose upon DOE higher costs of

characterization later.

119.    Based upon defendants' representations, the government had an expectation that

items would be characterized as they were being consolidated and relocated.

120.    However, during 1995, the exact date being presently unknown to plaintiff,

without informing the government, defendants abandoned the ongoing inventorying and

characterization of items as they were being consolidated and located.  This has resulted in a

substantial increase in the costs to DOE of processing and disposing of the contents of the

MSA's, which increase in costs DOE would not have had to incur had defendants carried out the

RARP in accordance with the representations they made to the government to induce the

government to approve of the payment of government funds to finance the RARP.

### Defendants' False and Fraudulent Statements Regarding
### The MSA's, RCRA Non-Compliances, and Listed Wastes

121.    Beginning in the early 1990's and continuing through April 1998, defendants

submitted statements to DOE, EPA, the State and others that were false or fraudulent by reason

of their failure to disclose the presence in the MSA's of hazardous wastes, their failure to

disclose the listed nature of certain hazardous wastes including wastes contaminated with spent

TCE, and their failure to disclose that defendants: had not made hazardous waste determinations,

had not complied with land disposal restrictions for hazardous wastes, had failed to comply with

hazardous waste shipment requirements, had operated a hazardous waste disposal facility

without a permit or interim status, and had not complied with RCRA permit conditions, as

32

alleged in paragraphs 50-95, above.  Defendants made these statements with actual knowledge of the falsity of their statements, or with reckless disregard of whether their statements were true or false, or with deliberate ignorance of whether their statements were true or false.  Defendants knew that regulators' discovery of the unreported RCRA non-compliances could lead to the reduction of the payments they were receiving from the government under their government contracts.  Defendants' false and fraudulents statements included, but were not limited to, those described below.

122.    In Environmental Reports in 1990, 1991, and 1992, defendants falsely and fraudulently stated that the C-746-S and C-746-T landfills were used for disposal of sanitary trash and nonhazardous wastes, which statements were false and fraudulent inasmuch as defendants knew that mixed and hazardous wastes had been disposed of in those landfills.

123.    In a December 7, 1992 memorandum, an MMES employee stated that the PGDP contained a large amount of inactive process equipment that could contain RCRA hazardous wastes, and that the areas where the equipment was stored could be considered to be storing hazardous wastes without a RCRA permit, resulting in the issuance of NOV's by regulators.

124.    In a 1994 Environmental Report, defendants falsely and fraudulently stated "[t]he Paducah site is in compliance with the requirements of [DOE Order 5400.1] through implementation of the regulatory requirements of . . . RCRA . . . , and other federal and state environmental statutes."  This representation was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

125.    The annual report for calendar year 1994, which defendants prepared and caused to be submitted to government was false and fraudulent inasmuch as it failed to disclose the

33

RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

126.     The annual report for calendar year 1995, which defendants prepared and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

127.     During 1995, USEC and DOE began to discuss a proposal to have DOE "de-lease" the MSA's from USEC so as to facilitate the Nuclear Regulatory Commission's ("NRC's") issuance to USEC of a license to operate the uranium enrichment facilities.

128.     On December 22, 1995, defendants prepared and caused to be submitted a report to DOE, which DOE in turn transmitted to the NRC, entitled "DOE Stored Materials at GDP Leased Facilities." This report purported to identify the kinds, amounts and locations of the items DOE was storing in USEC-leased facilities at the PGDP based on a survey conducted by the defendants. This report was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

129.     On April 23-24, 1996, the Energy Systems Environmental Compliance organization from Energy Systems' Oak Ridge, Tennessee headquarters, assessed the compliance status of the contents of the MSA's in the process buildings at the PGDP.  This environmental compliance assessment was performed at the request of DOE due to DOE's concerns that movement of items in the MSA's during the RARP may have created some environmental non-compliances of which DOE wanted to be apprised prior to deciding to de-lease the MSA's from USEC.

34

130.    The report issued by Energy Systems falsely and fraudulently stated that "There is no DOE RCRA-hazardous or mixed waste stored on USEC-leased space." This report was also false and fraudulent inasmuch as it failed to disclose that defendants had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above, and for the further reasons described in paragraph 121, above.

131.    On May 28, 1996, based on the foregoing false and fraudulent representations, DOE entered into an agreement with USEC to de-lease the MSA's.

132.    In or about September 1996, Energy Systems submitted to DOE a "Self-Assessment Report" regarding environmental management at the PGDP. This report was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above, and because it failed to disclose that defendants had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above.

133.    In December 1996, on the eve of DOE's execution of the final documents accepted the de-leasing of the MSA's from USEC, defendants began to disclose to DOE's site manager at the PGDP less than the full information known to them regarding environmental non-compliances in the MSA's. Their statements to the DOE site manager constituted false and fraudulent half-truths inasmuch as defendants acknowledged only that there "might be" "possible environmental non-compliances" due to the presence in the MSA's of containers of "unknown" or "unidentified" substances or of "miscellaneous equipment," when, as defendants knew, there were actual, long-existing, substantial RCRA non-compliances in those areas.

35

134.    With respect to MSA 400-04, for example, defendants stated that the MSA contained "unidentified materials in containers [that] could be hazardous," when, in fact, as defendants knew, that DMSA contained in illegal storage RCRA-regulated hazardous chemicals posing a risk of bodily injury and property damage, including a container of hyrdofluoric acid with a label stating: "Hydrofluoric Acid.  Corrosive Material.  Danger!  Hazardous Liquid and Vapor Causes Severe Burns."  Defendants' statements were also false and fraudulent inasmuch as defendants failed to disclose that they had knowingly increased the ultimate costs to DOE of processing and disposing of the contents of the MSA's through the abandonment of inventorying and characterization, as described in paragraph 120, above, and the other non-compliances described in paragraph 121, above.

135.    After being presented with these false and fraudulent half-truths, DOE's site manager agreed to final acceptance of the MSA's, and the MSA's were transferred back to DOE under the lease agreement between it and USEC.

136.    The annual report for calendar year 1996, which Energy Systems prepared with Utility Services' assistance and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

137.    In a May 12, 1997 memorandum, Energy Systems' manager at the PGDP, Jimmy Massey, acknowledged that wastes and equipment containing fluids had been placed in the MSA's in likely non-compliance with State/EPA regulations.  Massey stated: "I will not warrant that the [MSA's] are 'clean' because I know they are not."

36

138.    In an August 14, 1997 memorandum, an Energy Systems employee wrote that "[e]nvironmental noncompliances are a significant concern [in the MSA's]. A state regulator is expected to inspect the PGDP by Sept[ember] 30, 1997. NOV's and fines could be issued based upon his findings."

139.    In or about October 1997, defendants prepared and caused to be submitted a report to Congress which falsely and fraudulently stated "[o]ver the past four years, DOE activities at PGDP have been in compliance with [all environmental] permits with the following exceptions." The non-compliances described herein were not among the exceptions disclosed.

140.    In a November 11, 1997 memorandum to Steve Polston, the manager for Utility Services at the PGDP, Jimmy Massey warned that each company was in a position to cause its sister company to be subject to serious consequences from enforcement actions by regulators due to the wastes in the MSA's.

141.    The annual report for calendar year 1997, which Energy Systems prepared with Utility Services' assistance and caused to be submitted to the government was false and fraudulent inasmuch as it failed to disclose the RCRA non-compliances then existing in the MSA's and elsewhere at the site, and the other non-compliances described in paragraph 121, above.

142.    In a January 31, 1998 email, Jimmy Massey wrote that "[t]here are LMES contract performance impacts and fee at risk" if LMES were held accountable for the MSA problems.

143.    In early 1998, Bechtel Jacobs Company (BJC) was conducting due diligence at the PGDP with a view toward taking over as DOE's contractor in April 1998, when Energy Systems' contract expired. On January 26, 1998, Energy Systems' manager at the PGDP, Jimmy

37

Massey, advised BJC representatives that "steps necessary to ensure environmental compliance [with respect to the MSA's] have not been taken."

144.    In a letter dated June 12, 1998, Mr. Massey falsely and fraudulently stated to DOE that the MSA's "do not currently represent a noncompliant situation and do not require cost and schedule for corrective action to resolve the potential for uncharacterized materials." Mr. Massey further stated that tasks regarding the MSA's were being performed with "the assumption that hazardous materials are not contained in these areas . . . ."

145.    In a "Key Issues Summary" dated August 29, 1999, Jimmy Massey admitted that state regulators had not been informed about the MSA's.

146.    Meanwhile, beginning in 1986 or earlier, Energy Systems knew that TCE was used at PGDP almost exclusively to degrease equipment and therefore that virtually all TCE contamination at the site was traceable to a source that rendered the TCE a listed hazardous waste, as opposed to a characteristic hazardous waste. In a January 24, 1989 document, for example, an Energy Systems waste manager stated: "Trichloroethylene is and has been used at PGDP exclusively for degreasing and is therefore a listed hazardous waste (F001)." He further stated that the groundwater at the site "contains [TCE and therefore] is a listed hazardous waste."

147.    Beginning no later than 1988, it was known that groundwater "plumes" flowing underground in several directions from the PGDP site contained TCE. Energy Systems had sufficient information to have determined at that time that groundwater contaminated with TCE was a listed hazardous waste. However, Energy Systems continued to identify the groundwater plumes as merely characteristic on the ground that Energy Systems lacked sufficient information to know that the TCE infiltrating the groundwater had come from degreasing activities, when, in fact, it knew that TCE was used almost exclusively for degreasing. The implication was that

38

groundwater and soil samples obtained through hundreds of monitoring wells at PGDP could be stored and disposed of in non-RCRA permitted units and landfills and other facilities, when in fact such storage and disposal violated RCRA.

148.    In 1990, DOE specifically inquired of Energy Systems whether liquids and sludge in a facility known as the "C-403 neutralization pit" might be listed due to the presence of TCE. After preparing a series of internal analyses concluding that "neut pit" contents were in fact listed, Energy Systems sent DOE a formal letter response falsely and fraudulently stating the opposite conclusion.

149.    In its formal letter response, Energy Systems suggested to DOE that the only TCE getting into the neut pit resulted from "drippings" of TCE falling off of uranium enrichment condensers, automobile-sized pieces of enrichment equipment, that were held by cranes in building 400 to be degreased by TCE vapors from the large degreasing tank.  However, Energy Systems knew that as much as 25 gallons of TCE would condense inside of the bends and nodules of the pipe-like condensers and come spilling out of the condensers when they were placed on the floor next to the tank.  That TCE would run down the floor drain adjacent to the tank and through piping into the neut pit.  The Energy Systems employees who prepared the formal letter response to DOE interviewed building 400 employees involved in degreasing, and thus were aware that the quantities of TCE from degreasing flowing into the neut pit were large, rather than simply constituting "drippings" as they were falsely described in the letter.

150.    Energy Systems' internal analyses also pointed out several other pathways through which TCE was flowing into the neut pit besides the floor drain next to the large degreaser tank.  However, the letter to DOE omitted any reference to these various pathways,

39

and, as already noted, suggested that the only source of TCE to the neut pit was drippings off the condensers.

151.    By thus "sanitizing" the information it passed along to DOE, Energy Systems falsely and fraudulently portrayed the neut pit TCE as fitting within an exception EPA had carved out to the requirement that TCE from degreasing be deemed a listed hazardous waste. This EPA guidance stated that *de minimis* drips of TCE from degreased ball bearings was not a listed waste. In the letter, Energy Systems represented to DOE that the TCE infiltrating the neut pit came exclusively from drippings comparable to the ball bearing situation, when, in fact, Energy Systems knew, but omitted to tell DOE, that there were a variety of pathways of TCE to the neut pit and that the flows were considerably more substantial than drops from ball bearings.

152.    In a report to Energy Systems dated February 1, 1993, one of Energy Systems' subcontractors, Science Applications International Corporation("SAIC") informed Energy Systems that "[i]f groundwater contamination at the PGDP can be attributed to a source that has [been] managed or is currently [being] manag[ed] [as] a listed waste the groundwater must be treated as the listed waste until the waste is removed." The report further stated:

> [T]he information available to date, including the Phase II investigation and the groundwater study you provided, would clearly constitute "available site information" or "some information" showing that the TCE is either F001, F002 or U228 listed hazardous wastes or both.

The report concluded:

> This is an exceedingly complicated scenario with significant criminal, civil and operational implications if it is not handled correctly. We recommend express regulatory approval of any conclusions made that TCE is not a listed waste but is merely characteristic. Even though express approval would likely not be a total defense to future regulatory enforcement action . . . , it would be on a far higher plane for defense purposes than mere tacit

40

> approval—such as by discussing this in a CERCLA
> workplan—would be. . . . We recommend that the regulators be
> directly approached with this proposal and fully briefed on its
> implications and the issues involved before the facility takes
> definitive action. (emphasis in original)

153.   In meetings during 1994, and continuing throughout the remainder of its tenure as

DOE's contractor at the PGDP, without disclosing fully the information known to it, Energy

Systems falsely and fraudulently represented to DOE that groundwater plumes, personal

protective equipment contaminated with TCE, and soil and water contaminated by TCE be

treated as characteristically hazardous only, not as listed, due to an absence of sufficient

information showing that the TCE in question was from degreasing.

154.   As a result of its misrepresentations and false statement regarding TCE,

throughout the 1990's, Energy Systems illegally and in violation of RCRA stored listed

hazardous wastes in various locations at the PGDP including in the MSA's, illegally and in

violation of RCRA treated hazardous wastes at various locations at the PGDP including

buildings C-400 and C-752, and disposed of RCRA listed hazardous wastes in landfills at the

PGDP and other disposal sites, resulting in the recent issuance by regulators to DOE of Notices

of Violation.

155.   Additionally, during the 1990's, Energy Systems failed to properly evaluate

thousands of containers of waste to determine whether they constituted listed hazardous wastes,

despite the fact that some of its employees internally advised Energy Systems that a

determination whether the contents were listed was a threshhold requirement that should be

accomplished prior to conducting so-called "Toxic Characteristic Leaching Procedures" (TCLP)

testing to assess whether the contents were hazardous by characteristic.  Instead, Energy Systems

knowingly skipped over making a listing determination and proceeded directly to conduct

41

expensive TCLP testing. As a result, DOE has recently concluded that thousands of containers of wastes at the PGDP will need to be re-evaluated to determine if they are in fact listed wastes, and some of the containers that should have been listed were illegally and in violation of RCRA stored in non-RCRA permitted storage and/or disposed of in landfills and other sites not permitted to receive RCRA-hazardous wastes.

156.    By reason of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1), defendants knowingly presented, and caused to be presented, to an officer and employee of the United States government false and fraudulent claims for payment and approval, to wit, its various requests and demands, under its contract and otherwise, for money or property of the United States in the form of payments of costs, award fees, and incentive fees, as further described in paragraph 158, below.

157.    Furthermore, by reason of the foregoing conduct, and in violation of 31 U.S.C. § 3729(a)(2), defendants knowingly made, used, and caused to be made and used false records and statements to get false and fraudulent claims paid and approved by the government, to wit, claims for costs, award fees and incentive fees, as further described in paragraph 158, below. Defendants' false records and statements included, *inter alia,* the various false and fraudulent documents, statements, representations, concealments, and omissions described above.

158.    By reason of defendants' violations of the False Claims Act, the United States was damaged because it paid more in costs, award fees, and incentive fees, than it would have paid had it known the truth. The claims paid by, and the damages suffered by, the United States were as follows:

(a)    From time to time, the government has paid various claims for government funds through bank accounts upon which defendants drew in paying the costs of managing and

42

operating the PGDP.  These include costs of implementing RCRA-compliant waste management and environmental restoration programs, costs of preparing and submitting annual reports and other documents described above, costs of the RARP, costs of characterizing wastes, and costs of cleaning up the MSA's.  By reason of defendants' false and fraudulent statements, claims and conduct as alleged above, the government has paid more in costs than it otherwise would have paid, had the government known the truth; and will continue to incur more in costs in connection with cleaning up the MSA's, making listed waste determinations on thousands of containers at the PGDP, and testing and remediating the landfills at the PGDP, than it otherwise would have been required to pay, had the government known the truth.

(b)    By reason of defendants' false and fraudulent statements, claims and conduct as alleged above, the government paid defendants more in award fees and incentive fees for contract performance than it otherwise would have paid, had the government known the truth. The estimated award fees actually paid to Energy Systems were approximately as follows:

| Fiscal Year | Amount |
|---|---|
| 1994 | $10,825,913 |
| 1995 | $11,949,077 |
| 1996 | $38,425,340 |
| 1997 | $17,088,000 |
| 1998 (part of year) | Figure not available at this time |

The estimated performance-based incentive fees actually paid to Energy Systems were approximately as follows:

| Fiscal Year | Amount |
|---|---|
| 1996 | $ 5,987,000 |

43

|  |  |
|---|---|
| 1997 | $ 6,152,500 |
| 1998 (part of year) | Figure not available at this time |

The estimated incentive fees actually paid to Utility Services were approximately as follows:

| Fiscal Year | Amount |
|---|---|
| 1994 | $ 1,500,000 |
| 1995 | $ 4,289,652 |
| 1996 | $ 3,929,465 |
| 1997 | $ 3,112,889 |
| 1998 | Figure not available at this time |
| 1999 (part of year) | Figure not available at this time |

159.    Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

## COMMON LAW CLAIMS

### Count 7 - (Breach of Contract)

160.    This is a claim by Plaintiff United States against defendants for breach of contract.

161.    Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 159, inclusive.

162.    By reason of the acts set forth above, defendants breached their contracts with the United States for the management and operation of the PGDP including those provisions of the contracts described above.

44

163.   By reason of defendants' breaches of contract, the United States sustained damages consisting of the payments described in paragraph 158, above.

164.   Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia,* by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

<u>Count 8 - (Payment under Mistake of Fact)</u>

165.   This is an alternative claim to the breach of contract claim by plaintiff United States against defendants, for payment under mistake of fact.

166.   Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 164, inclusive.

167.   The United States made payments to defendants under the contracts in the mistaken belief that defendants were fully performing their contracts. Such payments were made by mistake of fact and were not authorized by law.

168.   As a result of such mistaken and unauthorized payments, the United States sustained damages.

169.   Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia,* by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

<u>Count 9 - (Unjust Enrichment)</u>

170.   This is an alternative claim by plaintiff United States against defendants, for payment by mistake of fact.

45

171.    Plaintiff United States incorporates by reference herein the allegations made above in paragraphs 1 through 169, inclusive.

172.    Plaintiff paid to defendants monies by which, as a result of the facts and circumstances stated above, defendants have been unjustly enriched at the expense of the United States.

173.    By reason of these payments, plaintiff is entitled to the return of the amount by which defendant has been unjustly enriched.

174.    Defendants Martin Marietta Corporation and Lockheed Martin Corporation are liable, *inter alia*, by reason of the guarantees they issued to the government of the full and faithful performance by Energy Systems and Utility Services of those companies' obligations to the government.

## PRAYER

WHEREFORE, plaintiff United States prays for judgment against the defendants, jointly and severally, as follows:

A.    As to Counts 1- 5, for civil penalties against the defendants in the amount of $25,000 per day for each violation of the applicable RCRA statutes, rules and regulations governing the management of hazardous waste occurring prior to January 31, 1997, and in the amount of $27,500 per day for each violation of the applicable RCRA statutes, rules and regulations governing the management of hazardous waste occurring on or after January 31, 1997, as alleged in Counts 1 through 5, plus post-judgment interest, attorneys fees and costs;

B.    As to Count 6, under the False Claims Act, for treble the damages sustained by the United States, which also include investigative costs, and which will be proven at trial, plus

46

civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation, post-judgment interest, and attorneys fees and costs;

      C.      As to the Count 7, breach of contract, against defendants in the amount equal to the damages suffered by the United States, plus pre-judgment and post-judgment interest, and costs;

      D.      As to the Count 8, payment under mistake, for the sums mistakenly paid by the United States, which will be proven at trial, and for pre-judgment and post-judgment interest, and costs;

      E.      As to the Count 9, unjust enrichment, for the sums by which defendants have been unjustly enriched, which will be proven at trial, plus pre-judgment and post-judgment interest, and costs;

Plaintiffs United States also prays for:

      F.      Such other relief as this Court may deem just and proper, together with interest and costs.

47

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MONICA WHEATLEY
Acting United States Attorney


WILLIAM F. CAMPBELL
Assistant U.S. Attorney
510 W. Broadway, 10th Floor
Louisville, Kentucky 40202
(502) 582-6773


MICHAEL F. HERTZ
STEPHEN D. ALTMAN
JOHN A. KOLAR
DONALD J. WILLIAMSON
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9301

WILLIAM WEINISCHKE
STEVEN A. KELLER
Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-4592

Attorneys for the United States

48

OF COUNSEL:

Frank S. Ney
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, SW
Atlanta, Georgia  30303
(404) 562-9532

# APPENDIX A
## SOLID WASTE MANAGEMENT UNITS ASSESSMENT REPORTS
### (SWMU) (213 through 359)

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| 213 | OS-02 | ? to Present | According to current USEC employees, the waste in this area includes a spill storage tank, old "drop test" cylinder with overpack, metal parts from forklifts, cranes, cylinder slings, and carts. The site also contains wood to make cylinder saddles. | 4,853 ft³ |
| 214 | OS-03 | 1994 to Present | • 55-gallon drums of absorbent pads and other solid waste generated by PGDP Utilities Operations at C-611 and from a clean-up at KPDES Outfall 008<br>• 55-gallon drums of ferric sulfate marked for reuse fiberglass panels removed from either the C-611-C Flocculator or the C-611-U Chemical Storage Area in 1993<br>• a small quantity of scrap metal banding material<br>• one out-of-use fuel oil tank that was removed from the basement of C-611 that fed the back-up diesel generators (empty) one pole type electrical disconnect<br>• scrap pieces of lumber<br>• several wooden pallets<br>• several 55-gallon drums marked empty<br>• two empty plastic oil containment dikes | 242 ft³ |
| 215 | OS-04 | Unknown | Waste/sludge in bottom of the car. | 3,024 ft³ |
| 216 | OS-05 | The initiation of this area as a storage area for fire extinguishers is unknown. However, according to a current Bechtel Jacobs employee, in 1997 or 1998, the majority of the fire extinguishers were placed in a covered metal bin located next to the roped portion of the | Motor, pallets, three 5-gallon containers, three 55-gallon drums (one labeled "metal-C-310"), fire extinguishers, wheels, and miscellaneous scrap metal and equipment. | 126 ft³ |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | storage area. | | |
| 217 | OS-06 | Late 70's to present | Waste drums, wood, pipe, toilets, old signs, concrete, electrical wire, tires, motors, pipe, scrap metal, fiberglass tank, and a large volume of other miscellaneous materials. | 55,949 ft$^3$ |
| 218 | OS-07 | Circa 1993 to Present | Wooden pallets, drums (labeled "asbestos pipe insulation", and "rad"), office furniture, air conditioners, motors, and unidentified plastic wrapped items. | 18,150 ft$^3$ |
| 219 | OS-08 | 1989-1992 | Fiberglass tank-empty | 4,722 ft$^3$ |
| 220 | OS-09 | 1993 to present | Scrap cushmans and golf carts, tires, metal, and industrial washing machine, wooden pallets, eight passenger vehicles, one tow motor, and a front-end loader. | 3,400 ft$^3$ |
| 222 | OS-11 | 1993 to present | Ladders, chairs, wooden pallets, motors, tires, and a engine block. | 1,200 ft$^3$ |
| 223 | OS-12 | Circa 1985 to present | Electrical motors, transformers, electrical supplies, cooling tower wood, LLW-soil cuttings, asbestos, scrap metal and spill cleanup material. | 2,700 ft$^3$ |
| 224 | OS-13 | 1996 to present | Empty vendor drums (in bin next to delinated DMSA area). | None in roped-off area, 356 ft$^3$ of drums in bin adjacent to the roped-off area. |
| 225 | OS-14 | Unknown | Unknown personnel recollections from former and current USEC, DOE and/or Bechtel Jacobs employees are valuable as discussed previously. | 17,232 ft |
| 226 | OS-15 | 1976 to present | Process equipment and coolers are likely stored in the converter shells. | 22,585 ft$^3$ (includes UF6 cylinders, which were moved in summer of 2000). |
| 227 | OS-16 | 1980's to present | Current USEC employees and DOE/BJC representative toured the DMSA and identified the following:  Wooden pallets, cooling tower fans and gear boxes, air conditioners, bicycles, hydraulic pumps, transformers, fixtures from compressor & converter shops, and material from the 1970's Process Equipment Modification program. | 29,600 ft$^3$ |
| 228 | OS-17 | The operational dates for this site are | Forklifts, tow motors, miniature pumper trucks, and concrete culverts. | 26,760 ft$^3$ |

51

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | unknown; current USEC employees believe that the last equipment was probably placed in this area in late 1996. | | |
| 229 | OS-18 | Early 1950's present | Scrap metal, concrete, two small huts/buildings, trashcans, railroad ties, fans, chain link fencing, and parts from railroad cars. | 20,500 ft$^3$ |
| 230 | C-310-A-01 | Late 1950s – approximately 1990 | 4 Pumps | 240 ft$^3$ |
| 231 | C-310-02 | 1978 to Present | Currently contains two large metal bins, scrap metal, wood, radiological storage bags and an aluminum impeller. The cage also contains ½-inch aluminum rods and equipment wrapped in plastic. | 1,600 ft$^3$ |
| 232 | C-310-03 | 1960's (for abandoned in place equipment). | Process equipment (abandoned), motors, piping, scrap metal, a scale, pumps and, other miscellaneous materials. According to former USEC employees, there are two condensate tanks which are still active in this area. The condensate tanks are the responsibility of USEC. | 2,300 ft$^3$ |
| 233 | C-310-04 | 1950s to approximately 1975 likely discontinued use of these pumps much earlier than 1975, according to a current USEC employee. | Vacuum pumps and associated piping. | 600 ft$^3$ |
| 234 | C-310-05 | N/A | Air dryer | 100 ft$^3$ |
| 235 | C-331-01 | 1993-1995 to present | Process piping and exchange heater. | 864 ft$^3$ |
| 237 | C-331-03 | 1993-present | Pallet of capped piping, 3 plastic covered wooden boxes, 2 pallets of curved hose/tubing/piping. | 300 ft$^3$ |
| 238 | C-331-04 | 1993-present; the drums have an accumulation date of 1994. | Asbestos-26 drums. | 272 ft$^3$ |
| 239 | C-331-05 | 1993-present | Barrel pump and cart with PCB < 50 ppm (according to waste container label), plastic wrapped equipment, motors, scrap wood and metal, old mail tube containers, wooden boxes of electrical equipment, and other miscellaneous equipment. | 9,607 ft$^3$ |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| 240 | C-331-06 | 1993-present | Plastic wrapped equipment, scrap metal, cardboard boxes. | 2,000 ft$^3$ |
| 241 | C-331-07 | 1993-present | This DMSA contains one wooden box with a radioactive label on the end. The contents of the box are unknown. | 22.5 ft$^3$ |
| 243 | C-331-09 | Equipment present since at least 1976. | UF6 converters, miscellaneous metal parts. | 1,746 ft$^3$ |
| 244 | C-331-10 | 1993-present | Plastic wrapped equipment and pallets, B-25 box labeled "empty," wooden pallets. | 2,100 ft$^3$ |
| 245 | C-331-11 | 1993-1995 (One of the transformers has an idle equipment/material storage tag with a 1987 date). | Four large transformers. | 2,361 ft$^3$ |
| 246 | C-331-12 | 1993 – present | Miscellaneous equipment – primarily metal maintenance type equipment, wooden boxes, scrap wood and a large metal box. | 6,000 ft$^3$ |
| 247 | C-331-13 | 1993 – present | Enrichment converters from ORGDP, transformers, and associated piping. A label on the converters state that the equipment may contain high assay material. | 2,490 ft$^3$ |
| 248 | C-331-14 | 1993 – present | Process piping, B-25 box, coils, miscellaneous metal parts, many labeled with "legacy equipment" rad tags, plastic wrapped freezer/sublimer vessel, and a pressure tank. | 9,550 ft$^3$ |
| 249 | C-331-15 | 1993 – present | Includes Harshaw catalysts, boxes labeled "Kaiser" and "Alcoa" chemicals, workbenches, trash cans, process equipment, carts, 48 B-25 boxes, cooling tower fan blades, motors, drums labeled "cathodic protection," a tank labeled "lube oil," one piece of equipment segregated for NCS purposes with tag stating, "K-25/PORTS equipment containing < 50 g U," and a tank labeled *Toxic Fungicide for Tower Spraying Only*." | 10,878 ft$^3$ |
| 250 | C-331-16 | 1993 – present | Forty-two B-25 boxes labeled "c-zone junk", "motor starters switch boxes," (Labeled full 3/25/96) "rotors/starters" and other miscellaneous plastic wrapped equipment. | 7,200 ft$^3$ |
| 251 | C-331-19 | 1993 – present | Three pieces of mechanical equipment on pallets, one empty wooden pallet, and three storage cabinets. | 128 ft$^3$ |
| 252 | C-331-20 | 1993 – present | Three pieces of mechanical equipment on pallets, one empty wooden pallet, and three storage cabinets. | 128 ft$^3$ |
| 253 | C-331-22 | 1993 – present | Plastic wrapped UF4 drums, compressor shafts, carts, compressor parts. Some of the items are labeled "DMSA No. 8". | 3,127 ft$^3$ |
| 255 | C-331-24 | 1993 – present | Four plastic-wrapped motors; plastic wrapped wooden pallets. | 280 ft$^3$ |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| 256 | C-333-01 | 1995 – present | Compressor rotors/stators, two B-25 boxes containing RAD material, acetylene gas cylinder, tires, carts, wooden pallets, gloves, scuffs, motors, and miscellaneous debris. | 7,216 ft³ |
| 257 | C-333-02 | 1987 to Present | Low-level Waste Drums containing low-level waste. | 3,276.7 ft³ |
| 258 | C-333-03 | 1987 to present. | Low-level Waste Drums, containing low-level waste. | 3,276.7 ft³ |
| 259 | C-333-04 | 1987 to Present | Low-level Waste Drums. | 1,884.13 ft³ |
| 260 | C-333-05 | 1987 to Present | Low-level Waste Drums. | 2,636 ft³ |
| 261 | C-333-06 | 1987 to Present | Low-level Waste Drums. | 1,904 ft³ |
| 262 | C-333-07 | 1987 to Present | Low-level Waste Drums | 1,308.7 ft³ |
| 263 | C-333-08 | 1987 to Present | Low-level Waste Drums. | 1,294.4 ft³ |
| 264 | C-333-09 | 1987 to Present | Low-level Waste Drums. | 288 ft³ |
| 265 | C-333-10 | 1987 to Present | Low-level Waste Drums. | Currently empty. |
| 266 | C-333-11 | 1995 to Present | Metal pallet, pipe, valves, 55-gal. Drum with the word "welding" on the label, scrap metal, and process equipment. | 919 ft² |
| 267 | C-333-12 | 1987 to Present | Low-level Waste Drums. | 2936.7 ft³ |
| 268 | C-333-13 | 1987 to Present | Low-level Waste Drums. | 1,775 ft³ |
| 269 | C-333-14 | 1987 to Present | Low-level Waste Drums. | 688 ft³ |
| 270 | C-333-15 | 1987 to Present. | Low-level Waste Drums. | 465 ft³ |
| 271 | C-333-16 (west) | 1995 to present | Two large cabinets containing supplies. | 150 ft³ |
| 272 | C-333-16 (east) | 1995 – Present | Eight drums of motor oil, wooden pallets, sixteen B25 boxes labeled "tools, excess parts, scrap metal, copper cable, wire," welding machines, and unidentified wrapped equipment wrapped in plastic. | 1,300 ft³ |
| 273 | C-333-17 | 1987 to Present | Low-level Waste Drums. | 1,912 ft³ |
| 274 | C-333-18 | 1995 to Present | Presently contains wooden pallets, drip/spill absorbent pads and plastic. | None |
| 275 | C-333-19 | 1995 to Present | Iron piping, wooden pallets, aerosol can and a bucket of miscellaneous debris. An RCW supply line and a freon piping/pump/compressed gas cylinder assembly which is part of facility operations is located in this area and is not part of SWMU. | 760 ft³ |
| 276 | C-333-20 | 1995 to Present. | Wooden pallets, plastic covered equipment, scrap metal, piping, hose, equipment with exhaust pipe running through south wall outside the building, metal locking file cabinets, large spools of wire, fan and fan housing, tow B-25 boxes, and large metal mobile tank.  The mobile tank is called a slurry tank.  The tank was used to flush condensers.  The tank is | 7,562.7 ft³ |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | | believed to be empty; however, chromate residue may remain. | |
| 277 | C-333-21 | 1995 to Present. | Large mobile (wheeled) equipment, window unit air conditioner, wooden tool box on wheels, large wire spools, "Dust Vent" particulate control equipment, lockers, and a large tank or pipe in the back of the area adjacent to the wall of the building. | 2,204 ft$^3$ |
| 278 | C-333-22 | 1995 to Present. | Wooden boxes of black threaded rods, large black vacuum pump (located within a contamination zone in the DMSA), cardboard boxes, miscellaneous metal pipes, wooden pallets, and a ladder. | 1,500 ft$^3$ |
| 279 | C-333-23 | 1995 to Present. | Fan housing and louvers, carts, scale, hose and/or wire spools, drum labeled "clean oil," freezer sublimer process panel, ladder, metal bins, and other miscellaneous equipment and materials. | 6,888 ft$^3$ |
| 280 | C-333-24 | 1987 to Present. | Low-level Waste Drums. | 1441.4 ft$^3$ |
| 281 | C-333-25 | 1987 to Present. | Low-level Waste Drums. | 2,636 ft$^3$ |
| 282 | C-333-26 | 1987 to Present. | Low-level Waste Drums. | 1,294.4 ft$^3$ |
| 283 | C-333-27 | 1987 to Present. | Low-level Waste Drums. | 944 ft$^3$ |
| 284 | C-333-28 | 1987 to Present. | Low-level Waste Drums. | Empty (currently). |
| 285 | C-333-29 | 1987 to Present. | Low-level Waste Drums. | 628 ft$^3$ |
| 286 | C-333-30 | 1987 to Present. | Low-level Waste Drums. | 328 ft$^3$ |
| 287 | C-333-31 | The area has been used from at least 1980-present for the storage of converter shop equipment. The surrounding area is used for storage of process equipment. | Enrichment process compressors, pumps, B-25 boxes, and an assortment of material and equipment. | 46,627 ft$^3$ |
| 288 | C-333-34 | 1987 to Present. | Low-level Waste Drums. | 1,834.1 ft$^3$ |
| 289 | C-333-35 | 1987 to Present. | Low-level Waste Drums. | 1,644 ft$^3$ |
| 290 | C-333-37 | 1995 to Present. | Twenty-four drums of activated carbon, (200 lb/drum) wooden pallets, and plastic. There are also two unidentified pieces of equipment (possibly dry-type transformers), stored in the area. | 352 ft$^3$ |
| 291 | C-333-38 | 1995 to Present. | No identification on the boxes other than the word "RAD". | 300 ft$^3$ |
| 292 | C-333-39 | 1995 to Present | One drum labeled "used exhaust fan belts," large wooden crates, some open (containing what are probably dry-type transformers), plastic wrapped equipment, one window unit air | 2,408 ft$^3$ |

55

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | | conditioner, a compressed gas tank, and other miscellaneous equipment. | |
| 293 | C-333-40 | 1995 to Present. | One large piece of process equipment (coolant condenser) (labeled "cell 3,000") resting on a large wheeled cart.  The cart is like a converter cart. | 908 ft³ |
| 294 | C-333-41 | 1995 to Present. | Approximately 144 drums (55 gallon) labeled "asbestos, RAD, contaminated, metal, pig pads, etc." | 1,187 ft³ |
| 295 | C-333-42 | 1995 to Present. | Current inventory consists of approximately 31 drums (55-gal) containing RAD contaminated floor sweep and mop heads. One 5-gallon can containing metal shavings with oil residue. There are metal and wooden pallets stacked randomly throughout the area.  One B-25 box with evidence that something leaked on top of it.  There is also an absorbent pad on the B-25 box, that appears to have been used to soak up a spill.  (There is a PCB trough overhead but no evidence that the spill originated from the trough). | 364 ft³ |
| 296 | C-333-43 | 1995 to Present. | Two propylene glycol drums and one other drum in spill pan labeled "one 55 gal drum/pan," another spill pan (unlabeled) with four drums, many other drums containing lube oil spill pads, asbestos, and other materials.  Three large cabinets with assorted materials, a large (pressure type) tank, lockers, insulation, used oil, and other miscellaneous equipment and material. | 8,917 ft³ |
| 298 | C-335-02 | 1987 to Present. | Metal motor coils, 7 metal flanges, 2 metal pallets, 3 metal baskets, one large 4-way choker, and miscellaneous process equipment. | 2,260 ft³ |
| 299 | C-335-03 | 1997 to Present. | Twenty-one valve operators on 10 steel pallets, drums of LLW, process piping, six molecular sieves, valves, 4-ft. metal conduit and one electrical motor. | 8,076 ft³ |
| 300 | C-335-04 | 1994 to Present. | Miscellaneous process equipment, four pallets of flanges, five electrical panels, two metal drums, five process spacers, sand bags, wooden pallets, hoses, and cords. | 2,743 ft³ |
| 301 | C-335-05 | 1994 to Present. | Process equipment, scrap metal, coolers, metal pallets, etc. | 17,761 ft² |
| 302 | C-335-06 | 1994 to Present. | Piping, flanges, motors, and boxes wrapped in black plastic sheeting. | 400 ft³ |
| 303 | C-335-07 | 1994 to Present. | Process motors, three equipment tanks, and miscellaneous equipment wrapped in plastic. | 810 ft³ |
| 304 | C-335-08 | 1994 to Present. | Motors, process tanks, scrap wire and two rolls of cable, metal cabinets, piping, fan guards, scale, and chairs. | 16,086 ft³ |

56

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| 305 | C-335-09 | 1993 – Present. | UF4 drums, plastic wrapped work table/vise, air conditioner housing, process gas pipe, wagon with metal fixture, "B" balance pipe, wire baskets, chart readers, and other equipment wrapped in plastic sheeting. | 4,580 ft$^3$ |
| 306 | C-335-11 | 1993 – Present. | Sandbags, cardboard trash, wrapped metal basket guards, one piece of expansion piping, scrap metal, wood pallets, hopper full of scrap wood. | 205 ft$^3$ |
| 307 | C0-35-12 | 1993 – Present. | Four drums of Linde Molecular Sieves and associated hose and piping on a metal pallet. | 10 ft$^3$ |
| 308 | C-337-01 | 1987 to Present | PCB low-level Waste Drums. | 855 ft$^3$ |
| 309 | C-337-02 | 1987 to Present. | PCB Low-level Waste Drums. | 1,459 ft$^3$ |
| 311 | C-337-04 | 1983 to Present. | PCB Low-level Waste Drums. | 2,364 ft$^3$ |
| 312 | C-337-05 | 1983 to Present. | PCB/LLW Drums. | 3,208 ft$^3$ |
| 313 | C-337-06 | 1989 to Present. | PCB/LLW Drums. | 880 ft$^3$ (120 - 55-gallon drums) |
| 314 | C-337-07 | 1990 to Present. | PCB Low-level Waste Drums. | 880 ft$^3$ (120 – 55-gallon drums) |
| 315 | C-337-08 | 1983 to Present. | PCB/LLW Drums. | 730 ft$^3$ (65-85 gallon overpacks) |
| 316 | C-337-09 | 1983 to Present. | PCB/LLW Drums. | 1,094 ft$^3$ (96-85 gallon overpacks) |
| 317 | C-337-10 | 1987 to Present | PCB/LLW Drums. | 547 ft$^3$ (45-85 gallon overpacks) |
| 318 | C-337-11 | 1983 to Present. | PCB/LLW Drums. | 729 ft$^3$ (64-85 gallon overpacks) |
| 319 | C-337-12 | 1990 to Present. | PCB/LLW Drums. | 6,739 ft$^3$ (66-85 gallon overpacks and 809-55 gallon drums) |
| 320 | C-337-13 | 89 to Present | PCB/LLW Drums. | 1,736 ft$^3$ (233-55 gal. Drums and 1- |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | | | 85 gal. Overpack) |
| 321 | C-337-14 | 1983 to Present. | PCB/LLW Drums. | 1,094 ft³ (96-85 gallon overpacks). |
| 322 | C-337-15 | 1983 to Present. | PCB/LLW Drums. | 730 ft³ (64-85 gal. overpacks) |
| 323 | C-337-16 | 06/17/1983 to Present | PCB/LLW Drums (sludge and soil) | 730 ft³ (64-85 gal. overpacks) |
| 324 | C-337-17 | 06/17/1983 to Present. | PCB/LLW Drums (sludge and soil). | 1,094 ft³ (96-85 gal. Overpacks) |
| 325 | C-337-18 | 1987 to Present. | PCB/LLW Drums. | 1,392 ft³ |
| 326 | C-337-19 | 1987 to Present. | PCB/LLW Drums. | None |
| 327 | C-337-20 | 1987 to Present. | PCB/LLW Drums. | 1,280 ft³ |
| 328 | C-337-21 | 10/3/84 to Present. | (3) – 7A Type A – 4x4x8 metal boxes | 2,208 ft³ |
| 329 | C-337-23 | 1995 to Present. | 13 scrap fans, 1 pump, 1 pack PVC and metal piping | 614 ft³ |
| 330 | C-337-25 | 3/29/63 to Present. | 5-out of service transformers, scrap metal from Column D-9 scrap pile, vehicles, pipes, insulation. | 14,400 ft³ |
| 331 | C-337-27 | 1994 to Present. | Flammable cabinet, generator, scrap metal, a/c unit, compressed gas cylinder, welder, trashcans. | None |
| 332 | C-337-29 | 11/19/94 to Present. | 20-B-25 boxes, 3 leaking poly tanks, and scrap metal. | 2,648 ft³ |
| 333 | C-337-30 | 1987 to Present. | PCB/LLW Drums. | 1,446 ft³ |
| 334 | C-337-31 | 5/10/93 | 12 F/S panels 3x3x7, 1 oven 2x4x5, 3 chillers 6x6x4, and 1 wooden crate 5x5x2. Possible hazardous waste in F/S panels (circuit boards, fuses, and light bulbs). | 640 ft³ |
| 335 | C-337-32 | Early 1980s to present as a diked PCB storage area-released by USEC on 12/31/96. | Two large out-of-service PCB transformers of a type normally filled with PCB dielectric fluid.  The transformers have been drained but not decontaminated. | 1,800 ft³ |
| 336 | C-337-33 | Early 1980s to present as a diked PCB storage area-released by USEC on 12/31/96. | Four out-of-service electrical transformers of a type normally filled with PCB dielectric fluid.  The transformers have been drained but not decontaminated. | 960 ft³ |
| 338 | C-337-35 | 2/5/1997 to Present. | Scrap metal. | 640 ft³ |
| 339 | C-337-36 | 2/5/97 to Present. | Miscellaneous Equipment (2-20' sealand containers 2 "000" compressor & carts, freon condensers) container inventory shows both sealands to contain pallets and wood from top 11 | 2,560 ft³ |

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | | DMSAs. | |
| 342 | C-337-39 | 1987 to Present. | PCB Low-level Waste Drums (currently empty) | 730 ft$^3$ (64-85 gallon overpacks) |
| 343 | C-337-40 | 1983 to Present. | PCB/LLW Drums (sludge and soil) | 1,668 ft$^3$ |
| 344 | C-337-41 | 1997 to Present. | Miscellaneous equipment (i.e. scrap metal, fan cover, lockers) | 5,954 ft$^3$ |
| 345 | C-337-42 | 1987 to Present. | LLW Drums (rags and trash) and one pallet of scrap metal. | 2,592 ft$^3$ |
| 346 | C-337-43 | 1997 to Present. | LLW Drums (asbestos, rags, floor sweep, trash) | 888 ft$^3$ (120-55 gallon drums) |
| 347 | C-337-44 | 02/05/1997 to Present | Low-level Waste Drums (asbestos, rags). | 1,066 ft$^3$ (144-44 gallon drums) |
| 348 | C-337-45 | 02/05/1997 to Present | LLW Drums (asbestos, pads, absorbent). | 2,013 ft$^3$ (272-55 gallon drums). |
| 349 | C-400-01 | No. 6 Dissolver 1960's – 1970's Blakeslee degreaser 1970's – 1980's | Blakeslee degreaser, Dissolver No. 6 tanks and associated piping. | 9,000 ft$^3$ |
| 350 | C-400-04 | 1960's – 1970's MFL Processing 1970's – 2000 storage area | The following waste was removed from this room in 2000: 10 and 20 gallon carboys, 5 gallon glass bottles, 30 and 55-gallon steel drums, 5 gallon steel and plastic buckets, and pieces of chemical process equipment items.  Entry into the area determined that one 55-gallon steel drum contained aqueous HF; a carboy contained a neptunium/nitric acid solution; 2 containers contained aqua regia (nitric and hydrochloric acid) organic bleach; sodium orthosilicate; and used oil. | 4,500 ft$^3$ |
| 351 | C-400-05 | Early 1950s until mid-to-late 1970s. | Mock converter, compressor, and UF6 piping.  From the test loop doorways these items were seen; 55 gallon drum of aluminum oxide, six 5-gallon drums of "technique," plastic wrapped item, electrical process equipment, trash, carboys, hoses, PVS pipes, soda ash, 30 gallon drum of freon , Mercury magnometer, metal containment pans, two drums of silicone, two cans of paint (?), tire slices, two vacuum cleaners, two drums of asbestos material, helium cylinder, oxyacetylene cylinders, other miscellaneous parts, supplies, and equipment. | 192,000 ft$^3$ |
| 352 | C-400-06 | Not used after 1974. The exact operation dates are unknown. | Tank structures and remaining residues.  The sulfuric acid tank has approximately 112 gallons of liquid remaining.  Residuals in some of the tanks contain regulated levels of metals in | 6,000 ft$^3$ |

59

| UNIT # | DMSA NAME | DATES OPERATED | WASTE DESCRIPTION | WASTE QUANTITY |
|---|---|---|---|---|
| | | | PCBs. | |
| 353 | C-400-07 | Start-up date unknown-equipment used until the mid 1980s. | Process equipment. | 6,000 ft³ |
| 354 | C-409-01 | According to a former USEC employee, the PEM program conducted between 1976 and 1979. The area still contains excess material. | The area contains excess material such as motors, pumps, exercise treadmills, garbage cans, and a large saddle (to hold the converters during pressure decay testing). | 3,000 ft³ |
| 355 | C-409-02 | According to a former USEC employee, the stabilization stands were used primarily between 1976-1979. | Process equipment, miscellaneous excess material, typewriters, etc.; are stored outside the stands as well as inside. At one time the area was used to store sodium fluoride (NaF) traps. Some NaF may still be stored inside the stands. | 3,000 ft³ |
| 356 | C-720-01 | Active. | Tanks, piping, and varnish. | 600 ft³ (approximately 400-500 gallons of varnish) |
| 357 | C-720-02 | Before 1970 and mid-1970s. | Vacuum induction furnace, 4 large floor fans, shoe scuffs and gloves, wooden pallet, large cardboard tube, several buckets. Compounds used in the furnace include silver, phosphorous, cadmium and lead. | 600 ft³ |
| 358 | C-720-03 | Vertical Turret Lathe probably operated from 1950s-1970s possibly into the 80s. | Excess equipment (possibly PCB contaminated), portable vacuum unit, trashcans, and large panels used to block portions of C-720 from sight for security purposes. | 1,200 ft³ |
| 359 | C-720-04 | 1950s-mid 1980s. | Metal milling machine, containing an oil reservoir. | 200 ft³ |

# EXHIBIT B

## SETTLEMENT AGREEMENT

### I. PREAMBLE AND PARTIES

A.     Plaintiffs-Relators Natural Resources Defense Council, Inc. (NRDC), Thomas B. Cochran, Ronald B. Fowler, Charles F. Deuschle, and Susan Jenkins (collectively, NRDC Relators) and John David Tillson (Tillson) (Tillson and the NRDC Relators are hereinafter referred to, collectively, as the Relators) are plaintiffs in a consolidated *qui tam* action in the United States District Court for the Western District of Kentucky, styled *United States of America ex rel. National Resource Defense Council, et al. v. Lockheed Martin Corporation, et al.*, U.S. District Court for the Western District of Kentucky, Civil Action No. 5:99CV00170-GNS (formerly designated as 5:99CV00170-M, under which Case No. 5:00-CV-39-M was consolidated.) (hereinafter, the "Civil Action").

B.     This Settlement Agreement (Agreement) is entered into among the following entities:

1.  Lockheed Martin Corporation and its predecessor, Martin Marietta Corporation (collectively, Lockheed Martin Corporation); Lockheed Martin Energy Systems, Inc. and its predecessor, Martin Marietta Energy Systems, Inc. (collectively, Energy Systems); and Lockheed Martin Utility Services, Inc. and its predecessor, Martin Marietta Utility Services, Inc. (collectively, Utility Services).  Lockheed Martin Corporation, Energy Systems and Utility Services are hereinafter referred to, collectively, as the Defendants;

2.  The NRDC Relators;

3. Tillson;

4. All current counsel who appear on behalf of the NRDC Relators or Tillson in connection with or relating to the Civil Action, including, but not limited to, Grant & Eisenhofer P.A. (G&E), Willam F. McMurry & Associates (McMurry), Egan, Fitzpatrick, Malsch & Lawrence, PLLC (Egan), and Stanley W. Whetzel, Jr., Pence & Ogburn, PLLC (Whetzel). All current counsel for NRDC Relators and Tillson are hereinafter referred to, collectively, as Relators' Counsel.

5. All of the foregoing are hereafter collectively referred to as "the Parties."

C.     The Civil Action involved certain claims brought by the Relators and/or the United States under the civil False Claims Act, the Resource Conversation and Recovery Act, and the common law. All of these claims were settled by a separate settlement agreement dated February 26, 2016 (the "Primary Settlement Agreement"). The Primary Settlement Agreement provides that all claims and issues concerning the Relators' and Relators' Counsel's entitlement to reimbursement of attorneys' fees, costs, and expenses will be resolved by the contemporaneous execution of this Agreement.

D.     "Covered Conduct," as referred to below, shall include any and all claims that were asserted, or could have been asserted, by Relators or Relators' Counsel in the various complaints filed by the NRDC Relators and/or Tillson in the Civil Action.

E.     This Agreement is neither an admission of liability or wrongdoing by Defendants nor a concession by Relators or Relators' Counsel that their claims are not well-founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

## II. TERMS AND CONDITIONS

A.      Defendants agree to pay Relators' reasonable attorneys' fees, costs and expenses pursuant to 31 U.S.C. §3730(d)(1) or otherwise as follows:  Defendants shall pay the amount of $550,000.00 USD (Five Hundred and Fifty Thousand Dollars) (the "Fee Settlement Amount") to James Sabella, Grant & Eisenhofer P.A., by wire transfer within ten business days of the later of (i) the full and complete execution of this Agreement or (ii) the receipt by Defendants' Counsel of wiring instructions for Grant & Eisenhofer P.A.  By executing this Agreement, the Parties recognize that the Fee Settlement Amount will be retained and/or disbursed among Relators' Counsel (and/or Relators) by James Sabella, Grant & Eisenhofer P.A., and will constitute full payment of the Fee Settlement Amount by Defendants to Relators and Relators' Counsel, fulfilling Defendants' obligations under this Agreement.

B.      By executing this Agreement, and in consideration for the payment of the Fee Settlement Amount in this Agreement, the payment of the Settlement Amount in the Primary Settlement Agreement, and the withdrawal of Defendants' pending motions (including Defendants' motions asserting that Relators are not proper relators in the Civil Action or should be dismissed from the Civil Action), Relators and Relators' Counsel, for themselves and for their predecessors, heirs, successors, attorneys, former attorneys, agents, partners, former partners, and assigns, hereby agree to waive, release, and forever discharge Defendants and their predecessors, successors, assigns, businesses, affiliates,

subsidiaries, divisions, parent or sister companies, conservators, employees, agents, counsel, representatives, officers, directors and shareholders from any liability arising from or related to all claims, causes of action, suits, actions or demands that were asserted or that could have been with respect to attorney fees, costs and expenses, pursuant to 31 U.S.C. § 3730(d) related to the Covered Conduct.

C.     Defendants and their predecessors, successors, assigns, businesses, affiliates, subsidiaries, divisions, parent or sister companies, conservators, employees, agents, counsel, representatives, officers, directors and shareholders release Relators and Relators' Counsel and their predecessors, heirs, successors, attorneys, former attorneys, agents, partners, former partners, and assigns from any and all claims arising out of or relating to 31 U.S.C. § 3730(d), in relation to the Covered Conduct.

D.     Each Party shall bear its own legal and other costs incurred in connection with the preparation and performance of this Agreement.  This paragraph does not affect any claims arising under or based upon obligations created by this Agreement.

E.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

F.     Upon full and final execution of this Agreement, Defendants will agree, in accordance with the Primary Settlement Agreement, to withdraw their motions asserting that Relators are not proper relators in the Civil Action or should be dismissed from the Civil Action.  Defendants take no position as to what portion of the proceeds of the Primary Settlement Agreement shall be paid to Relators or Relators' Counsel.

G.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United

States District Court for the Western District of Kentucky. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

H.     This Agreement constitutes the complete agreement between the Parties. There are no terms, understandings, covenants, or representations, whether written or oral, which are a part of, or upon which the Parties are relying in entering this Agreement or which may be implied, other than those expressly set forth and expressly referenced in these provisions.   Any other prior or contemporaneous understandings, statements, representations, or agreements, whether written or oral, between the Parties with respect to the Covered Conduct are hereby superseded in their entirety.

I.     This Agreement may not be amended except by written consent of the Parties.

J.     The undersigned counsel, James Sabella, Esq. and Grant & Eisenhofer, P.A., specifically represent and warrant that they are fully authorized to execute this Agreement on behalf of all Relators and Relators' Counsel.

K.     NRDC Relators, G&E, McMurray, Egan, Tillson, and Whetzel represent and warrant that there are no other individuals, companies, partnerships, or law firms with an interest in the proceeds of this litigation (including, but not limited to, the Fee Settlement Amount and the Primary Settlement Amount).   Furthermore, Egan agrees to jointly and severally indemnify and hold harmless Defendants from any claims asserted against Defendants arising out of a claimed interest in the Fee Settlement Amount, the Settlement Amount in the Primary Settlement Agreement, and any other attorneys' fees,

expenses, or costs relating to the Civil Action or this Agreement raised by former employees of the Egan firm, Malsch & Cynkar, PLLC, Cooper & Kirk PLLC, Morris & Player, and attorneys Andrew Grosso, Thomas A. Marshall, and their current and former firms. Additionally, Whetzel agrees to jointly and severally indemnify and hold harmless Defendants from any claims asserted against Defendants arising out of a claimed interest in the Fee Settlement Amount, the Settlement Amount in the Primary Settlement Agreement, and any other attorneys' fees, expenses, or costs relating to the Civil Action or this Agreement raised by Pedley & Gordinier, PLLC or his prior firm, including the lawyers formerly at those firms. Finally, G&E agrees to jointly and severally indemnify and hold harmless Defendants from any claims asserted against Defendants arising out of a claimed interest in the Fee Settlement Amount, the Settlement Amount in the Primary Settlement Agreement, and any other attorneys' fees, expenses, or costs relating to the Civil Action or this Agreement raised by lawyers formerly employed by G&E.

L.      The Relators do not make any demand for, and release and waive any entitlement to or claim for, payment by Defendants of any attorneys' fees, expenses, or costs relating to the Civil Action or this Agreement on behalf of any individuals, companies, partnerships, or law firms not party to this Agreement. The Relators do not and will not consent to any individuals, companies, partnerships, or law firms not party to this Agreement seeking payment by Defendants of any attorneys' fees, expenses, or costs relating to the Civil Action or this Agreement.

M.      This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

N.      This Agreement is binding on Defendants' successors, transferees, heirs, and assigns.

O.      This Agreement is binding on Relators' and Relators' Counsel's predecessors, successors, transferees, heirs, and assigns.  This provision does not render assignable or transferrable claims that are otherwise non-assignable or non-transferrable.

P.      This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.  To be valid as to any Party, the agreement must be agreed to and executed by all Parties.

<u>DEFENDANTS</u>

DATED: 2/26/16          BY: _____

Michael J. Bronson, Esq.
VORYS, SATER, SEYMOUR & PEASE
LLP
*On behalf of Defendants*


<u>RELATORS AND RELATORS' COUNSEL</u>


Date: _____          _____

Geoff Fettus, Senior Project Attorney
Natural Resources Defense Council, Inc.
115 15th Street NW, Suite 300
Washington, DC 20005


Date: _____          _____

Dr. Thomas B. Cochran


Date: _____          _____

Charles F. Deuschle


Date: _____          _____

Ronald B. Fowler


Date: _____          _____

Susie Jenkins, as Administrator for the
Estate of Garland E. Jenkins


Date: _____          _____

John David Tillson


Date: _____          _____

JAMES J. SABELLA
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

<u>DEFENDANTS</u>

DATED: _____          BY: _____
                                  Michael J. Bronson, Esq.
                                  VORYS, SATER, SEYMOUR & PEASE
                                  LLP
                                  *On behalf of Defendants*

<u>RELATORS AND RELATORS' COUNSEL</u>

Date: 2/26/2016          _____
                         Geoffrey H. Fettus, Senior Attorney
                         Natural Resources Defense Council, Inc.
                         115 15th Street NW, Suite 300
                         Washington, DC 20005

Date: 2/26/2016          _____
                         Dr. Thomas B. Cochran

Date: _____      _____
                         Charles F. Deuschle

Date: _____      _____
                         Ronald B. Fowler

Date: _____      _____
                         Susie Jenkins, as Administrator for the
                         Estate of Garland E. Jenkins

Date: _____      _____
                         John David Tillson

Date: _____      _____
                         James J. Sabella
                         GRANT & EISENHOFER P.A.
                         485 Lexington Avenue, 29th Floor
                         New York, NY 10017
                         Telephone: (646) 722-8500
                         Facsimile: (646) 722-8501

-8-

DEFENDANTS

DATED: _____          BY: _____

                                Michael J. Bronson, Esq.
                                VORYS, SATER, SEYMOUR & PEASE
                                LLP
                                *On behalf of Defendants*


RELATORS AND RELATORS' COUNSEL


Date: _____          _____

                                Geoff Fettus, Senior Project Attorney
                                Natural Resources Defense Council, Inc.
                                115 15th Street NW, Suite 300
                                Washington, DC 20005


Date: _____          _____

                                Dr. Thomas B. Cochran

Date: Feb. 26, 2016            *Charles F. Deuschle*  Signed with permission by
                                Charles F. Deuschle                    Jennifer A. Williams

Date: Feb. 26, 2016            *Ronald B. Fowler*  Signed with permission by
                                Ronald B. Fowler                    Jennifer A. Williams

Date: Feb. 26, 2016            *Susan Jenkins*  Signed with
                                Susie Jenkins, as Administrator for the  permission by
                                Estate of Garland E. Jenkins          Jennifer A. Williams

Date: Feb. 26, 2016            *John David Tillson*  Signed with
                                John David Tillson                  permission by
                                                                   Jennifer A. Williams

Date: Feb. 26, 2016            *James J. Sabella*  Signed with permission
                                JAMES J. SABELLA              by Jennifer A. Williams
                                Grant & Eisenhofer P.A.
                                485 Lexington Avenue, 29th Floor
                                New York, NY 10017
                                Telephone: (646) 722-8500
                                Facsimile: (646) 722-8501

Date: _Feb 26, 2016_                    _Charles J. Fitzpatrick_
                                        CHARLES J. FITZPATRICK
                                        Egan, Fitzpatrick & Malsch, PLLC
                                        1777 N.E. Loop 410, Suite 600
                                        San Antonio, TX 78217
                                        Telephone: (210) 496-5001
                                        Facsimile: (210) 496-5011


Date: _____

                                        WILLIAM F. MCMURRY
                                        William F. McMurry & Associates
                                        624 W. Main Street, Suite 600
                                        Louisville, KY 40202
                                        Telephone: (502) 326-9000
                                        Facsimile: (502) 326-9001


Date: _____

                                        STANLEY W. WHETZEL, JR.
                                        Pence & Ogburn, PLLC
                                        9300 Shelbyville Rd., Suite 1205
                                        Louisville, KY 40222
                                        Telephone: (502) 736-6200

Date: _____

CHARLES J. FITZPATRICK
Egan, Fitzpatrick & Malsch, PLLC
1777 N.E. Loop 410, Suite 600
San Antonio, TX 78217
Telephone: (210) 496-5001
Facsimile: (210) 496-5011

Date: 2-26-16

WILLIAM F. MCMURRY
William F. McMurry & Associates
624 W. Main Street, Suite 600
Louisville, KY 40202
Telephone: (502) 326-9000
Facsimile: (502) 326-9001

Date: _____

STANLEY W. WHETZEL, JR.
Pence & Ogburn, PLLC
9300 Shelbyville Rd., Suite 1205
Louisville, KY 40222
Telephone: (502) 736-6200

Date: _____

                                        _____
                                        CHARLES J. FITZPATRICK
                                        Egan, Fitzpatrick & Malsch, PLLC
                                        1777 N.E. Loop 410, Suite 600
                                        San Antonio, TX 78217
                                        Telephone: (210) 496-5001
                                        Facsimile: (210) 496-5011

Date: _____

                                        _____
                                        WILLIAM F. MCMURRY
                                        William F. McMurry & Associates
                                        624 W. Main Street, Suite 600
                                        Louisville, KY 40202
                                        Telephone: (502) 326-9000
                                        Facsimile: (502) 326-9001

Date: February 26, 2016

                                        _____
                                        STANLEY W. WHETZEL, JR.
                                        Pence & Ogburn, PLLC
                                        9300 Shelbyville Rd., Suite 1205
                                        Louisville, KY 40222
                                        Telephone: (502) 736-6200